EDWARD B. HAGER AND JANE E. HAGER, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CONSTANTINE L. HAMPERS AND LAVONNE J. HAMPERS,
PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 11952–77, 283–78.    Filed May 14, 1981.

*L. Joyce Hampers* and *Richard R. Endacott,* for the petitioners.

*Charles W. Maurer, Jr.,* and *Peter J. Panuthos,* for the respondent.

SIMPSON, *Judge*: The Commissioner determined the following deficiencies in the petitioners' Federal income taxes:

| Petitioners | Year | Deficiency |
|---|---|---|
| Edward B. Hager | 1971 | $10,345.57 |
| Edward B. Hager and Jane E. Hager | 1972 | 8,132.62 |
| | 1973 | 18,964.17 |
| Constantine L. Hampers and Lavonne J. Hampers | 1971 | 13,731.00 |
| | 1972 | 2,971.00 |
| | 1973 | 3,459.00 |

The Commissioner concedes that his determination of a deficiency in the tax of Dr. and Mrs. Hager for 1973 was the result of a

mathematical error and that, in fact, Dr. and Mrs. Hager overpaid their tax for 1973 by $18,964.17. However, such taxable year remains in issue for determining whether Dr. and Mrs. Hager made a further overpayment in such year. The sole issue for decision is whether the petitioners were entitled to deduct any part of the losses reported in 1971 through 1973 by a partnership of which Dr. Hager and Dr. Hampers were limited partners and which was engaged in the purchase and breeding of South Devon cattle.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Edward B. and Jane E. Hager, became husband and wife in 1972. They resided in South Lyndeboro, N.H., when the petition in this case was filed. Dr. Hager filed his individual Federal income tax return for 1971, and Dr. and Mrs. Hager filed their joint Federal income tax returns for 1972 and 1973, with the Internal Revenue Service, Andover, Mass. The petitioners, Constantine L. and Lavonne J. Hampers, husband and wife, resided in Weston, Mass., when they filed their petition in this case. They filed their joint Federal income tax returns for 1971 through 1973 with the Internal Revenue Service, Andover, Mass. Dr. Hager and Dr. Hampers will sometimes be referred to as the petitioners.

Dr. Hager and Dr. Hampers are medical doctors who specialize in nephrology. Dr. Hager was involved in the development of kidney transplantation, and Dr. Hampers was involved in the development of the artificial kidney. Both doctors have been heavily involved in providing artificial kidney services throughout the country.

In 1971, Dr. Hager and Dr. Hampers became limited partners of the U.S. South Devon Co. (USSD), a partnership organized for the purpose of purchasing South Devon cattle from a related partnership, Big Beef Hybrid International Co. (Big Beef). During the 1960's and early 1970's, a variety of European breeds of cattle were introduced into the United States for the first time. It was not uncommon for such cattle to sell in the United States at a substantial premium over the purchase price in the exporting country. At the time, American cattlemen were seeking new genetic stock to improve their herds, and they were

willing to pay high prices. In addition, there was a strong market in the country for domestic cattle and such market served to strengthen the demand for imported cattle.

The premiums paid for foreign cattle also reflected the time, expense, and risk involved in bringing such cattle into the country. The importer bore not only the cost of shipping the animals, but also the risk that in being transported from overseas the animals would become sterile as the result of stress or would injure themselves. In addition, in most cases, it was required that the cattle be quarantined for at least 30 days upon their arrival in the country to be sure they were free of disease. See 9 C.F.R. sec. 92.11–92.34 (1973).

During the 1960's, Canada established quarantine stations to facilitate the importing of cattle into North America. After being quarantined in Canada, cattle were permitted to enter the United States without further quarantine. See 9 C.F.R. secs. 92.11, 92.19–92.20. Most of the cattle brought to the United States from Europe during the late 1960's and early 1970's came through Canada.

Big Beef was formed as a limited partnership under Minnesota law in 1968.[1] Its general partners were James D. Bishop, Arthur V. Palmer, J. Bruce Stevenson, and two corporations. At least one of the corporations, Stevenson Bishop McCredie, Inc., was controlled by Mr. Bishop and Mr. Stevenson. Big Beef was formed for the purpose of acquiring South Devon cattle, a breed of cattle native to England. From 1968 through 1970, using the Canadian facilities, Big Beef brought at least 69 South Devons into the United States and Canada.

In 1970, Dr. Hager approached Mr. Bishop of Big Beef on behalf of himself and Dr. Hampers concerning the possibility of making an investment in the imported South Devons. The petitioners did not know Mr. Bishop personally; Mr. Bishop had been recommended to Dr. Hager by a relative of Dr. Hager. Mr. Bishop gave Dr. Hager a written proposal in which Big Beef offered its entire herd (with the birth of new calves, 234 animals) "for sale with a leaseback * * * for 3 years." The proposal set the price at $3 million and stated that half of the

---

[1] In 1972, the assets of Big Beef were transferred to a newly formed corporation, Big Beef Hybrids International, Inc. We shall refer to both the partnership and the corporation as Big Beef.

purchase price would be required in cash and half in the form of a nonrecourse promissory note secured by the cattle, that the sale would be made through USSD, and that Big Beef would be required to pay lease fees totaling $720,000. The proposal included a sample calculation of the return which could be expected by a limited partner of USSD. The calculation set forth the depreciation, interest, and other expenses which USSD would incur under the proposal. The calculation indicated that such expenses would be greater than the lease fees but that, nevertheless, the partners would realize a return on their contributions to USSD since USSD's expenses would be deductible from the income of the partners for Federal income tax purposes. The calculation did not indicate that the value of the herd would be likely to rise in the future, or that the nonrecourse note was to be repaid, or that aggregate lease fees under the 3-year lease and any future leases were ever expected to exceed aggregate expenses.

In promoting investments in South Devon cattle, Mr. Bishop told Dr. Hager and others that after the sale Big Beef intended to test the cattle thoroughly to establish the quality of the breed and to create demand for it. He stated that after the quality of the breed was established, Big Beef would market semen collected from the bulls; according to Mr. Bishop, there were no plans to market the animals themselves. Mr. Bishop also represented to Dr. Hager and others that Big Beef had acquired the exclusive rights to import South Devon cattle into the United States and that the value of such cattle, and of the semen of the bulls, would be likely to rise in the future. In considering the proposal, Dr. Hager did not obtain an independent appraisal of the cattle, or inspect the cattle, or seek to determine the prices at which South Devon cattle sold in England. He did discuss the proposal with his lawyer, and occasionally, he read publications of the cattle industry in an effort to educate himself.

During 1971, while Big Beef's proposal was outstanding, Big Beef was under commitment to ranchers to purchase cattle which had been sired by bulls owned by the company. Big Beef failed to fulfill all of its purchase commitments for such year. During 1971, Big Beef also lost whatever exclusive rights it may have had to import South Devon cattle, and in that year, at least one group of South Devons was imported by a Kansas rancher, William Scully. From the spring of 1971 to October 1971, agents

for Mr. Scully selected 29 cows and 6 bulls in England, quarantined them for about 2 weeks in Glasgow, Scotland, flew them to Canada and quarantined them again there, boarded them on a farm in Canada for a short time, and brought them to Kansas. Dr. Hager was not aware in 1971 that Big Beef had lost its exclusive rights to the South Devon breed or that Big Beef had failed to fulfill its purchase commitments.

USSD was created by an agreement of limited partnership dated December 15, 1971 (the partnership agreement). The general partners were Mr. Bishop and Stevenson Bishop McCredie, Inc. Dr. Hager and Dr. Hampers executed the partnership agreement as limited partners, and they made a joint contribution of $50,000 to the capital of USSD. There were 12 other limited partners, and the total amount of capital contributed by all limited partners was $612,500. Under the partnership agreement, the general partners were to contribute $1,000 each.

The partnership agreement allocated net income among the general and limited partners in accordance with the proportion of capital invested by each partner. Net losses were to be allocated in the same manner, except that such losses were to be allocated only to the limited partners until such time as each limited partner had received allocations equal to the amount of his capital contribution. The partnership agreement also provided that no partner was entitled as a matter of right to the return of his contribution or to withdraw from the partnership prior to termination, and that the partnership agreement could be amended in a writing signed by the two general partners and by limited partners who contributed more than half the capital contributed by limited partners.

The partnership agreement placed in the general partners full responsibility for managing the partnership. For their services, the general partners were to be paid, by February 1, 1972, a management fee of 5 percent of invested capital. Beginning with 1972, they were also to be paid a yearly fee of $5,000.

By an agreement of sale and purchase dated December 15, 1971 (the purchase agreement), executed by Mr. Bishop for USSD and by Mr. Stevenson for Big Beef, USSD contracted to purchase South Devon cattle from Big Beef. The proposal of Big Beef had contemplated the sale of 234 South Devons, but the purchase agreement provided that only 107 animals were to be

sold, 57 cows and 50 bulls (the cattle). Included among the cattle were 69 animals which had been purchased and imported by Big Beef at an aggregate cost of $98,532.98; the other 38 animals had not been imported by Big Beef but had been born into the herd. The aggregate purchase price of the cattle was set at $1,614,000, $15,000 per animal on average. The individual prices paid by USSD for 36 of the animals, and the prices paid earlier for such animals by Big Beef, are as follows: [2]

| Animal No. | Big Beef price | USSD price |
|---|---|---|
| 1 | $754 | $30,000 |
| 2 | 599 | 20,000 |
| 3 | 838 | 20,000 |
| 4 | 880 | 18,000 |
| 5 | 629 | 20,000 |
| 6 | 754 | 15,000 |
| 7 | 1,796 | 50,000 |
| 8 | 880 | 20,000 |
| 9 | 1,006 | 18,000 |
| 10 | 754 | 25,000 |
| 11 | 377 | 18,000 |
| 12 | 719 | 15,000 |
| 13 | 1,257 | 5,000 |
| 14 | 604 | 35,000 |
| 15 | 566 | 15,000 |
| 16 | 754 | 15,000 |
| 17 | 503 | 5,000 |
| 18 | 1,006 | 20,000 |
| 19 | 880 | 15,000 |
| 20 | 880 | 15,000 |
| 21 | 503 | 15,000 |
| 22 | 377 | 18,000 |
| 23 | 754 | 15,000 |
| 24 | 503 | 5,000 |
| 25 | 880 | 5,000 |
| 26 | 754 | 10,000 |
| 27 | 754 | 10,000 |

---

[2]Information is not available as to the individual prices paid by Big Beef for the other animals.

| | | |
|---|---|---|
| 28 | $704 | $15,000 |
| 29 | 754 | 5,000 |
| 30 | 880 | 15,000 |
| 31 | 880 | 3,000 |
| 32 | 905 | 5,000 |
| 33 | 604 | 15,000 |
| 34 | 754 | 20,000 |
| 35 | 629 | 10,000 |
| 36 | 629 | 15,000 |

During 1971, South Devon cattle of average quality normally sold in England for less than $1,000 per animal, and in that year, Mr. Scully purchased his South Devons, which were superior animals, and transported them to Kansas, at a total cost of approximately $3,000 per bull and $2,000 per cow.

To pay for the cattle purchased from Big Beef, USSD agreed to make a cash payment of $20,000, to execute a 4-percent promissory note for $529,000, payable to Big Beef on February 29, 1972 (initial note), and to execute a 7-percent promissory note for $1,065,000, payable to Big Beef on December 14, 1974 (term note).

In conjunction with the purchase agreement, Big Beef agreed to lease the cattle from USSD for a term to run until September 14, 1974. The agreement of lease (the leaseback) was dated December 15, 1971, and was executed by Mr. Bishop for USSD and by Mr. Stevenson for Big Beef. It provided that Big Beef was to pay all expenses for the care of the cattle, to reimburse USSD for losses resulting from abnormal cattle deaths, and to pay to USSD lease fees of $112,980 on December 14, 1972, and December 14, 1973, and of $159,782 on September 14, 1974. USSD retained the right to all calves born during the period of the leaseback, and it was entitled to $1 for each vial of semen collected by Big Beef from the bulls and sold. The leaseback also provided that Big Beef was to be permitted to repurchase the cattle from USSD after the expiration of the leaseback at fair market value less any balance outstanding on the term note.

On December 31, 1971, the sale-leaseback was closed. USSD paid $20,000 to Big Beef, and Mr. Bishop executed the initial note and the term note on behalf of USSD. As contemplated in Big Beef's proposal, the term note provided that Big Beef had no recourse against any partner of USSD in the event of default. Both notes were secured by the cattle. At the time of the closing,

68 of the animals purchased by USSD were located on a ranch in Stillwater, Minn.; the remaining animals were located on four other ranches in the United States and Canada.

The principal qualities of South Devon cattle are large size and the ability to gain weight quickly with minimum amounts of feed. Such cattle also are unusually fertile, and South Devon cows give birth with little difficulty and produce large quantities of milk. On the other hand, South Devon cattle have weak legs and consequently are unable to forage easily over large areas. In addition, they have relatively small amounts of lean beef, and sometimes, South Devon cows are unable to nurse their calves adequately because of poorly formed teats. The herd purchased by USSD included several excellent individual animals, but many of the animals were of low quality since almost one-third of the USSD herd had originally been sold to Big Beef in a "dispersal sale." A dispersal sale is the sale of an entire herd, and in such sale, the purchaser normally receives "culls," or low quality animals, as well as better animals.

On March 13, 1972, Mr. Stevenson, on behalf of Stevenson Bishop McCredie, Inc., and Mr. Bishop, executed a document certifying the formation of USSD as a limited partnership under New Jersey law. On April 13, 1972, Dr. Hager and Dr. Hampers executed an amendment of agreement of limited partnership which purported to add the following paragraphs, among others, to the original USSD partnership agreement:

11. *Election.* Each of the Partners hereby elects, pursuant to Section 761(a) of the Internal Revenue Code of 1954 * * * that the Partnership shall be excluded from the provisions of Subchapter K of the Code.

*     *     *     *     *     *     *

19. *Withdrawal of Partners; Partition.* Notwithstanding anything in this Agreement to the contrary, each Partner hereby expressly reserves the right (a) to withdraw from the Partnership and receive in exchange for his interest in the Partnership, his pro rata * * * undivided interest in all assets owned by the Partnership at the time of such withdrawal, and (b) to maintain an action for partition of any property owned by the Partnership in which he owns an individed [sic] interest.

USSD filed a Federal partnership return for 1971 which included the following statement: "All members of U.S. South Devon Company elect that U.S. South Devon Company be excluded from the provisions of Subchapter K of the Internal Revenue Code of 1954, as amended, pursuant to Section 761."

During 1972 and 1973, Dr. Hager received periodic reports

from Mr. Bishop. Mr. Bishop indicated that Big Beef was working to preserve its "monopoly" on South Devon cattle, that it was testing the cattle for such characteristics as weight gain, fertility, and meat quality, and that it would market semen once the quality of the breed was established. Dr. Hager was sent what appeared to be the results of tests conducted at an animal testing center in Nebraska, and the results were favorable.

In promoting a new breed of cattle, it is important to form a "breed association" to promote the breed and, more importantly, to register the pedigree of each animal. If an animal's pedigree is unknown, the animal cannot be relied upon to yield predictable and desirable characteristics in its young, and the animal is of substantially less value to a breeder than a similar animal which is registered. When Big Beef imported the South Devon cattle, there was no breed association in North America to register such animals, and Big Beef did not form such an association. However, 71 of the 107 animals had been registered with the South Devon breed association in England. In November 1973, the North American South Devon Association[3] was formed at the initiative of cattle owners other than Big Beef, and subsequently, some of the South Devons owned by USSD were registered with the association.

In the spring of 1973, Dr. Hager made a trip to inspect the cattle owned by USSD. It appeared to him that the cattle were receiving inadequate care. In early 1974, the petitioners were notified by the IRS that it was possible that USSD was an activity "not engaged in for profit" under section 183 of the Internal Revenue Code of 1954[4] and that, as a result, certain deductions claimed by the petitioners on their Federal income tax returns for 1971 and 1972 might be disallowed.

Sometime in 1973 or 1974, the petitioners retained the services of Richard Endacott, a cattleman and lawyer from Lincoln, Nebr., to negotiate their withdrawal from USSD. By an agreement dated December 13, 1974, executed by Mr. Bishop on behalf of USSD and Big Beef, and by the petitioners, the petitioners withdrew from USSD and received 8 South Devon

[3]The North American South Devon Association was at first named the International South Devon Association.

[4]All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

cattle as their pro rata share of the assets of USSD. The petitioners also assumed their pro rata share of USSD's indebtedness to Big Beef by executing a note payable to Big Beef in the amount of $76,000. Such note was payable December 14, 1977, and was secured by the 8 South Devons. Like the term note, it also provided that Big Beef had no recourse against the petitioners in the event of default.

On December 13, 1974, the petitioners also executed an agreement whereby they purported to lease their eight South Devons to Big Beef. Under the agreement, which was executed by Mr. Bishop for Big Beef, the petitioners were required to manage and care for the cattle and were entitled to any calves born during the term of the lease. The agreement also stated that "the purebred bull" received by the petitioners was to be available to Big Beef for the use of its semen and that:

As consideration for the availability of semen from said bull during the term of the lease, the Lessee shall offset the lease payment due against the interest due under the promissory note from Hager and Hampers dated December 13, 1974 in order that no lease payment or interest shall be paid by either party.

After the petitioners withdrew from USSD, Mr. Endacott agreed to care for the eight South Devons in return for half the calves born. Such cattle were transported to Mr. Endacott's ranch in Nebraska, and between March 26, 1975, and June 4, 1975, there were eight calves born. Mr. Endacott retained four of them, and, in addition, he purchased three of the other four. In 1975, the petitioners acquired an additional 25 South Devon cattle in repayment of an earlier loan of $100,000 made by them to Mr. Bishop, and they put such cattle in the care of Dr. T. E. Fitzpatrick, a cattleman and veterinarian in Iowa. In 1976, the cattle received by the petitioners from USSD were moved by the petitioners from Nebraska to a ranch in Texas. In 1977, the $76,000 promissory note came due, the petitioners defaulted, and such cattle were transferred back to Big Beef.

The North American South Devon Association sponsored a cattle sale each year. In 1974, the strong cattle market of the late 1960's and early 1970's weakened considerably, but at the first sale, held in that year, five purebred South Devons, all bulls, sold at an average price of approximately $4,740. Purebred South Devons sold at prices ranging from $800 to $3,300 at the

third sale, in 1976; from $675 to $2,250 at the fourth sale, in 1977; and from $425 to $3,050 at the fifth sale, in 1978.[5]

USSD paid the initial note in 1972. On December 13, 1974, the due date of the term note was extended to December 14, 1977, and the principal of such note was reduced from $1,065,000 to $989,000 to reflect the assumption of indebtedness by Dr. Hager and Dr. Hampers. From December 13, 1974, through December 31, 1978, the principal of the term note was further reduced to $512,000 as follows:

| Year | Item | Amount | Balance |
|------|------|--------|---------|
| 1974 | Payment | $189,500 | $799,500 |
| 1974 | Credit for receivable from Big Beef | 192,000 | 607,500 |
| 1975 | Payment | 54,000 | 553,500 |
| 1976 | Payment | 30,000 | 523,500 |
| 1978 | Payment | 11,500 | 512,000 |

On its financial statements for 1971 through 1978, USSD reported income and expenses as shown on page 770. In computing the reported income of $4,796.12 for 1975, the item described as "Loss on sale of cattle" was actually added to the other income for the year. If such item had been subtracted, USSD would have reported a net loss of $4,720.02. USSD reported no income from the sale of semen by Big Beef. The death losses were the result of the death of 5 animals in 1972, 6 in 1973, and 68 in 1974. In computing the amounts reported as death losses for 1973 and 1974, USSD subtracted from its actual losses reimbursements received from Big Beef in the amount of $2,828.39 in 1973 and $192,700 in 1974. The entire amounts of interest expense reported by USSD were incurred with respect to the initial and term notes, except that $25 of interest was paid on other indebtedness in 1972.

Under the partnership agreement, the petitioners' aggregate share of the losses reported by USSD was $35,900.22 for 1971, $36,721.91 for 1972, and $23,857.00 for 1973.[6] On their Federal

---

[5]Prices at the second sale are not available.

[6]The limited partners made capital contributions totaling $612,500. Thus, under the partnership agreement, the petitioners' share of USSD's loss for 1971 was $50,000/$612,500. Because of USSD's losses in 1971 and 1972, by the end of 1972, each limited partner had received allocations of losses at least equal to his capital contribution; as a result, in 1972 and

| | 1971 | 1972 | 1973 | 1974 | 1975 | 1976 | 1977 | 1978 |
|---|---|---|---|---|---|---|---|---|
| *Income* | | | | | | | | |
| Lease fee | --- | $112,980.00 | $112,980.00 | $159,782.00 | $102,000.00 | $76,000.00 | $26,000.00 | $50,000.00 |
| Cattle sales | --- | --- | --- | --- | --- | 11,651.65 | 15,565.13 | 600.00 |
| Miscellaneous | --- | --- | --- | --- | --- | --- | 371.77 | --- |
| *Expenses* | | | | | | | | |
| Interest | $77,947.38 | 50,803.69 | 96,612.00 | --- | 48,000.00 | 58,177.48 | 25,645.00 | 37,041.54 |
| Professional fees | 5,000.00 | 7,600.00 | 3,325.00 | 1,200.00 | 2,025.00 | --- | --- | 550.00 |
| Management fees | 18,568.45 | 12,056.55 | 5,000.00 | 4,500.00 | --- | --- | --- | 1,871.46 |
| Depreciation | 338,261.88 | 461,987.50 | 260,435.00 | 56,145.25 | 51,402.69 | 24,216.37 | 8,207.34 | 4,077.59 |
| Cattle death losses | --- | 30,475.50 | 34,682.00 | 84,180.62 | --- | --- | --- | --- |
| Miscellaneous | --- | 1,369.05 | 5,630.00 | 26.11 | 34.26 | 30.00 | 33.00 | 40.60 |
| Amortization of organization expense | --- | --- | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | --- |
| Loss on sale of cattle | --- | --- | --- | 10,680.41 | (4,758.07) | --- | --- | --- |
| Out-of-pocket expenses | --- | --- | --- | --- | --- | --- | --- | 872.00 |
| Travel | --- | --- | --- | --- | --- | --- | --- | 16.17 |
| Net income (loss) | (439,777.71) | (451,312.29) | (293,204.00) | 2,549.61 | 4,796.12 | 4,727.80 | 7,551.56 | 6,130.64 |

income tax returns for such years, the petitioners deducted the following amounts as their shares of USSD's losses: [7]

| Petitioner | 1971 | 1972 | 1973 |
|---|---|---|---|
| Dr. Hager | $20,524 | --- | --- |
| Dr. and Mrs. Hager | --- | $12,690 | $11,940 |
| Dr. and Mrs. Hampers | 20,524 | 21,608 | 11,940 |
| Total | 41,048 | 34,298 | 23,880 |

On an amended return for 1971, Dr. Hager reduced the amount deducted by him for such year to $17,878; on an amended return for the same year, Dr. and Mrs. Hampers reduced the amount deducted by them to $19,878. The amount deducted by Dr. and Mrs. Hager for 1972 did not include a share of USSD's cattle death loss for such year. On a supplemental schedule of gains and losses attached to their 1972 return, Dr. and Mrs. Hager reported $919 as Dr. Hager's share of USSD's cattle death losses for such year, but Dr. and Mrs. Hager did not deduct such amount on their Form 1040 (Schedule D).

On their Federal income tax returns for 1974, the petitioners reported the following aggregate amounts of income, expenses, and losses relating to the cattle activities of Dr. Hager and Dr. Hampers:

*Income*
Lease fee..................................... $13,002
*Expenses and losses*
Depreciation..................................... 4,568
Administrative..................................... 506
Death losses..................................... 6,850
Sale losses ..................................... 870

On the basis of these figures, Dr. Hager and Dr. Hampers realized an aggregate net income of $208 in 1974. However, in that year, they also incurred legal expenses of $2,351.21 in connection with their withdrawal from USSD.

---

thereafter, each of the two general partners was entitled to a share of losses in proportion to the $1,000 which he was required to contribute to capital, and the petitioners' share of losses for such years was therefore $50,000/$614,500.

[7] Dr. Hager and Dr. Hampers owned equal interests in USSD, but in 1971 and 1972, they did not deduct equal shares of USSD's losses. The petitioners and the Commissioner agree that the petitioners' pro rata share of losses should have been divided equally between Dr. Hager and Dr. Hampers.

On their Federal income tax returns for 1975 through 1977, the petitioners reported the following aggregate amounts of income and expenses relating to the cattle activities of Dr. Hager and Dr. Hampers:

|  | 1975 | 1976 | 1977 |
|---|---|---|---|
| *Income* | | | |
| Cattle sales | $5,600 | $5,388 | $8,888 |
| *Expenses* | | | |
| Insurance | 1,100 | --- | --- |
| Advertising | 224 | --- | --- |
| Trucking | 137 | 406 | 8 |
| Legal | 2,973 | 912 | --- |
| Miscellaneous | --- | 6 | 4 |
| Bank charges | --- | 7 | 4 |
| Veterinary fees | --- | 120 | --- |
| Repairs | --- | 870 | --- |
| Feed | --- | --- | 848 |
| Dues and registration | --- | --- | 392 |

On the basis of these figures, Dr. Hager and Dr. Hampers realized an aggregate net income of $1,166 in 1975, $3,067 in 1976, and $7,632 in 1977.

In his notices of deficiency, the Commissioner disallowed in full the deductions taken by the petitioners for 1972 and 1973 as a result of the membership of Dr. Hager and Dr. Hampers in USSD. In addition, he increased the income of Dr. and Mrs. Hager for 1972 by an additional $459.50, one-half of the $919 cattle death loss reported by them but not deducted. For 1971, the Commissioner did not consider the amended return of Dr. and Mrs. Hampers, and he disallowed the entire amount deducted by them on their original return. The Commissioner did consider the amended return of Dr. Hager for such year; in the notice of deficiency sent to Dr. Hager, he stated that none of the deduction claimed on such return was allowable, but in fact, he allowed an additional interest deduction of $3,175, the amount allocated to Dr. Hager by USSD for 1971.

OPINION

The ultimate issue to be decided is the extent to which the petitioners were entitled to deduct their share of the losses of USSD for 1971 through 1973. The Commissioner takes the

position first that the sale-leaseback entered into by USSD was an activity "not engaged in for profit" under section 183 and that, therefore, the deductibility of USSD's expenses and losses by the petitioners is subject to the limitations imposed by that section. He argues secondly that the term note did not represent genuine indebtedness of USSD since the principal amount of such note, he contends, greatly exceeded the value of the cattle which secured it. He concludes that the amounts paid as interest on such note were not interest in substance and that the principal amount of such note was not includable in the depreciable basis of the cattle. On the other hand, the petitioners take the position that it is irrelevant whether or not the sale-leaseback was entered into by USSD for profit; they insist that irrespective of whether Mr. Bishop and the other promoters of USSD expected a profit, Dr. Hager and Dr. Hampers invested in cattle with an expectation of a profit and that their expectation is determinative under section 183. The petitioners also vigorously contend that the cattle were fully worth what USSD paid for them and that the term note represented genuine indebtedness.

We will deal first with the issue concerning the term note. It is settled that amounts paid as interest must be paid on genuine indebtedness to be deductible under section 163(a) (*Knetsch v. United States*, 364 U.S. 361 (1960); *Narver v. Commissioner*, 75 T.C. 53, 98 (1980), on appeal (9th Cir., Jan. 15, 1981); *Golsen v. Commissioner*, 54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971)), and that depreciation must be based on an actual investment in property to be deductible under section 167 (*Narver v. Commissioner, supra* at 98; *Mayerson v. Commissioner*, 47 T.C. 340, 350 (1968)). In the usual sale of property, if part or all of the purchase price is deferred, the obligation to pay the deferred amount represents genuine indebtedness and an investment in property. Even if such an obligation is secured only by the transferred property or other property and the buyer has no personal liability for its payment, the obligation still represents genuine indebtedness and an investment in property. *Mayerson v. Commissioner, supra* at 351–352; see *Crane v. Commissioner*, 331 U.S. 1 (1946). However, such conclusions do not follow when the principal amount of such nonrecourse indebtedness unreasonably exceeds the value of the security therefor because, under such circum-

stances, it is patent that the purchaser has no incentive to pay off the obligation.

In *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), the taxpayers were partners in a partnership which purported to purchase a motel for $1,224,000 and lease it back to the sellers. None of the purchase price was paid at the time of sale, but it was to be paid in installments over 10 years and in a large balloon payment at the end of such period. The partnership, and therefore the partners, had no personal liability to make the payments; rather, the sellers' right to the payments was secured only by the motel. After the sale, the partnership made payments to the sellers for principal and interest, and the sellers made approximately equal payments to the partnership for rent.

The issue to be decided by the Ninth Circuit in *Estate of Franklin* was whether the taxpayers were entitled to deduct their distributive shares of the interest on the nonrecourse indebtedness and their shares of depreciation on the motel. In deciding such issue, the court found that the taxpayers had failed to demonstrate that the purchase price of the motel—the principal amount of the nonrecourse indebtedness—was approximately equal to the value of the motel. The court stated that if the purchase price had been approximately equal to the value of the motel, the deductions would have been allowable, but that because of the lack of proof, it could not be concluded that the partnership had made an investment in property or that the nonrecourse indebtedness was genuine. 544 F.2d at 1048–1049. The court reasoned that an investment in property exists only when the buyer acquires an equity in the property, and that when the principal amount of nonrecourse indebtedness created by a sale exceeds the value of the property sold, the buyer does not have an equity. Similarly, the court reasoned that genuine indebtedness is the use or forbearance of money, and that when nonrecourse indebtedness resulting from a sale unreasonably exceeds the value of the security therefor, the buyer has not obtained the use or forbearance of money. The court concluded by stating that its reasoning did not apply to cases where an excess in the amount of nonrecourse indebtedness over the value of the security therefor results from a bad bargain. 544 F.2d at 1048–1049.

In *Narver v. Commissioner, supra,* this Court adopted the

analysis of *Estate of Franklin*. In *Narver*, two partnerships jointly purchased a building at a grossly overstated price. No part of the price of the building was paid at the time of purchase; rather, as in *Estate of Franklin*, the price was to be paid in installments, and the obligation to make the payments was secured only by the building and not by the personal liability of the partners. Relying on *Estate of Franklin*, we found that because the principal amount of the nonrecourse indebtedness unreasonably exceeded the value of the building, and because the purchase of the building was not an arm's-length transaction, the nonrecourse indebtedness was not genuine and did not represent an investment in property. Accordingly, we held that the partners were not entitled to deduct their distributive shares of depreciation on the building or interest on the indebtedness.

In the present case, there is no question that if the principal amount of the term note was unreasonably in excess of the value of the cattle, such excess was not merely the result of a bad bargain. Both the general partners of USSD were also general partners of Big Beef, and the terms of the sale-leaseback clearly did not result from bargaining. The Commissioner recognizes that the value of the cattle may have equaled the cash payment by USSD and the initial note, and he has not challenged the genuineness of that note, the interest paid thereon, or the depreciation attributable to such note.[8] For the value of the cattle to equal the principal of that note, each animal had to be worth approximately $5,000 on the average. For the cattle also to equal the principal amount of the term note, each animal would have to be worth approximately $15,000 on the average. Thus, we must decide whether the average value of each animal exceeded $5,000 by a sufficient amount to indicate that the term note represented an investment and was genuine indebtedness.

In 1971, there was no established market in the United States

---

[8] It is possible that whenever a large amount of nonrecourse indebtedness is created in a sale of property and, as a result of the amount of such indebtedness, the buyer fails to acquire an equity in the property, the sale might be entirely disregarded for Federal income tax purposes. There is language in *Estate of Franklin* and in *Narver* supporting such result. However, the issue of whether or not a sale should be entirely disregarded under such circumstances was not actually before the Court in *Estate of Franklin* or *Narver*; in those cases, to disregard the nonrecourse indebtedness was to disregard the sale since the principal amount of the nonrecourse indebtedness was equal to the purchase price of the property sold. Nor is such issue present here, since the Commissioner has not raised it, and therefore, we will not address that issue in this case.

for South Devon cattle; thus, the petitioners and the Commissioner introduced the testimony of expert witnesses as to the value of the cattle. The first witness for the Commissioner was D. W. Montgomery. Mr. Montgomery had been a farm manager for Mr. Scully, and in his opinion, the cattle had a fair market value of $3,000 for each bull and $2,000 for each cow, or a total value of $264,000.[9] Essentially, Mr. Montgomery reached his conclusion by recognizing that Mr. Scully purchased and imported South Devons in 1971 at a cost of approximately $3,000 per bull and $2,000 per cow and by making the assumptions that the quality of the animals purchased by USSD did not exceed the quality of those imported by Mr. Scully and that USSD could have imported South Devons as readily as Mr. Scully. He testified that the cattle purchased by Mr. Scully were of superior quality, but that, on the whole, South Devons are not suited to the United States because their weak legs cause them to have difficulty in foraging over large areas. Mr. Montgomery also testified that his experience in appraising livestock was very limited, that he had had no personal experience in importing cattle, and that the South Devon breed was considered by Mr. Scully to be excellent.

The Commissioner's second witness was Howell K. Fesq, who was an engineer employed by the Internal Revenue Service. Mr. Fesq had had substantial experience in appraising cattle, and in his opinion, the cattle had a fair market value of not more than $2,000 each, or a total of $214,000. In reaching his conclusions, Mr. Fesq regarded several factors as significant: First, that in 1971, South Devon cattle sold in England at an average price of less than $1,000 per animal; second, that Mr. Scully was able to purchase and import South Devons in 1971 at a fraction of USSD's cost; third, that, in his opinion, the values assigned by USSD and Big Beef to many of the individual animals purchased by USSD bore no relationship to the prices originally paid by Big Beef for such animals; and fourth, that in years after 1971, when a market for South Devons had developed in the United States, even the highest quality South Devons rarely sold at a price higher than $2,000 to $5,000. Mr. Fesq admitted that during the late 1960's and early 1970's, imported breeds of cattle sometimes

---

[9]Mr. Montgomery's report actually states that the cattle were worth $262,000, but 57 cows at $2,000 each and 50 bulls at $3,000 each yields a total value of $264,000.

commanded unpredictably high prices, but he stated that such inflated prices generally did not persist as a breed became more widely available. He also admitted that USSD acquired several "top quality show animals," but in his opinion, the overall quality of the herd probably was not high since many of the animals had been purchased by Big Beef in a dispersal sale.

The final witness for the Commissioner was Dr. T. E. Fitzpatrick, who was a veterinarian and cattleman in Iowa and executive secretary of the North American South Devon Association. In Dr. Fitzpatrick's opinion, the cattle had a total value in 1971 of $298,400, $4,000 for each of the 71 animals registered with the breed association in England and $400 for each unregistered animal. In reaching his conclusion, Dr. Fitzpatrick, like Mr. Montgomery and Mr. Fesq, relied primarily on the fact that Mr. Scully had been able to import South Devons in 1971 at less than $3,000 per animal. In coming to the $4,000 figure, he reasoned that a purchaser of registered South Devons would be willing to pay a substantial premium above the amounts paid by Mr. Scully, in order to avoid the difficulties of the importing procedure. The $400 figure for unregistered animals reflected Dr. Fitzpatrick's belief that if an animal's pedigree is not certain, the animal is of less value to a breeder than a similar animal which is registered. Dr. Fitzpatrick's evaluation of the cattle was also based on a personal inspection of some of the animals. In 1971, out of curiosity, he had visited the ranch in Minnesota where most of the cattle destined for USSD were located. Many of the animals viewed by him possessed what he considered to be undesirable characteristics, such as weak legs and poorly formed teats, and in his opinion, USSD's animals were probably of lower quality than those of Mr. Scully. The inferiority of USSD's animals was also indicated, in Dr. Fitzpatrick's opinion, by the fact that many animals of the USSD herd died within several years after being imported, while, so far as Dr. Fitzpatrick was aware, Mr. Scully's herd thrived. On the other hand, Dr. Fitzpatrick testified that, on the whole, the South Devon breed was superb, that the years 1968 through 1973 were a period of high profits and rising prices in the cattle industry, and that it was sometimes difficult to obtain the necessary licenses to import cattle. He also testified that USSD might actually have been able to sell many of its South Devons at a price of $15,000 or more per animal if it had aggressively

marketed them, but that, so far as he was aware, the highest price ever paid for a South Devon animal by buyers other than USSD was $8,000.

The expert witness for the petitioners was Kenneth Hartman, who was the superintendent of livestock at the National Western Stock Show in Denver, Colo., and who occasionally had been employed by Big Beef as a consultant. In 1971 or 1972, Mr. Hartman had been requested by the individual general partners of Big Beef to appraise the South Devons imported by the company. Mr. Hartman spent 2 days in Stillwater, Minn., inspecting such cattle, and in April 1972, he concluded that, on average, such cattle had a value of $15,000 per animal.

Unlike the experts who testified for the Commissioner, Mr. Hartman focused not on the prices at which South Devon cattle sold in the exporting country but on the prices which imported breeds of cattle commanded in the United States. He testified that it was common for imported animals to be sold in the United States at a price 10 or more times higher than the purchase price of the animals abroad. As an example, he stated that during the period 1968 to 1971, he purchased a bull in France for $5,000 and, within a year, sold a one-half interest in the bull in the United States for $50,000. He also stated that certain French Charolais cows which had been purchased in France by a Texas cattleman, Walker Wilson, for $3,500 to $5,000 each, sold for approximately $50,000 each in the United States. To explain the high prices, Mr. Hartman testified that there was a strong, rising, cattle market in the country during the late 1960's and early 1970's and that there was a frenetic demand for new genetic stock to improve American breeds. According to Mr. Hartman, there were also institutional limitations on the number of animals which could be imported; he testified that it was not possible to import cattle at all until the Canadian quarantine stations opened in the 1960's and that, after the stations opened, they were of limited capacity and expensive.

Mr. Hartman also testified that his appraisal was based, in part, on the several outstanding qualities of the South Devon breed and on his belief that Big Beef had exclusive control over sales of the breed in the United States. He stated that he was aware of the shortcomings of the breed and that he considered them in valuing the cattle, but that if he had known that Mr.

Scully had brought South Devons into the country in 1971, his appraisal might have been lower.

The petitioners have a difficult burden to carry on the valuation issue in this case. They do not deny that in 1971 South Devon cattle normally sold in England for less than $1,000 per animal, but nevertheless, they take the position that the value of USSD's South Devon cattle was more than $10,000 per animal. This Court has observed several times that when, as here, a transaction between related parties results in a dramatic price increase, the increase is suspect. *Narver v. Commissioner*, 75 T.C. at 96; *Beck v. Commissioner*, 74 T.C. 1534, 1552 (1980), on appeal (9th Cir., Jan. 22, 1981). Although we are satisfied that Mr. Hartman is a knowledgeable and respected cattleman, we are constrained to conclude, when we carefully weigh the evidence, that the fair market value of the cattle did not exceed $5,000 per animal.

Primarily, we have strong doubts concerning Mr. Hartman's testimony that it was not possible to import cattle to the United States except through the Canadian quarantine facilities and that space in such facilities was very limited. Such testimony was crucial to the petitioners' position, for, unless the U.S. cattle market was effectively insulated from foreign markets, it would be difficult to believe that prices in the U.S. market could be 10 or 15 times higher than in the English market. Yet, Mr. Hartman specifically testified at trial that in the early 1960's a number of French Charolais cattle were imported through Mexico. He wholly failed to explain why USSD or other cattle purchasers could not have imported cattle through Mexico in later years. Moreover, we find nothing in the regulations of the U.S. Department of Agriculture which would have prevented cattle from being imported directly to the United States in 1971; in fact, such regulations specifically enumerate the ports of the United States through which cattle may be imported. See 9 C.F.R. sec. 92.1 et seq. (1971). It is true that cattle imported directly to the United States would have had to have been quarantined, but again, we do not understand why the quarantine procedure—which would seem relatively simple—could not have been performed in the United States. It may be that the Canadian facilities were inexpensive or simple to use and that as a result they attracted much business, but without some evidence, we cannot conclude that the Canadian facilities

somehow had achieved a monopoly on the quarantine procedure. What is more, even if there had been some sort of monopoly, Mr. Scully's use of the facilities in 1971 tends to belie Mr. Hartman's testimony that space in the facilities was unduly expensive; Mr. Scully purchased and imported his South Devons at a total cost of less than $3,000 per animal. On the whole, Mr. Hartman's testimony lacked the detail necessary to show that the U.S. cattle market was substantially uninfluenced by foreign markets.

Likewise, Mr. Hartman's testimony regarding the actual differences between U.S. and foreign cattle prices was insubstantial. He gave several examples of cattle which sold in the United States for many times the price in Europe, but there is no detailed evidence to show that such differences were the rule and not the exception or that they were not the result of extraordinary circumstances. Without better evidence, we are unable to believe that it was normal for foreign breeds of cattle to be worth as much as 10 times more in the United States than abroad. Furthermore, Mr. Hartman testified that when he made the appraisal, he was under the impression that Big Beef controlled all of the South Devons in the United States. As he admitted, his appraisal might have been lower if he had been aware of Mr. Scully's purchase.

Finally, we doubt that the animals purchased by USSD were, as Mr. Hartman testified, of consistently high quality. We know from Mr. Fesq that many of the animals had been purchased by Big Beef in a dispersal sale and that among such animals were probably culls. Also, Dr. Fitzpatrick's report states that Big Beef's animals were probably of lower quality than those of Mr. Scully and that, in fact, Big Beef's cattle adapted much more poorly to U.S. conditions than Mr. Scully's. It is true that USSD acquired some top quality animals, but on the whole, the evidence indicates that the quality of the herd was not high.

We are aware that there was a thriving cattle market in the United States in 1971. Moreover, even if the U.S. market was not effectively insulated from abroad, in our opinion, it may be that the time and expense involved in importing cattle did serve to create some buffer between the U.S. market and foreign markets. In fact, Mr. Fesq admitted that imported cattle sometimes sold at unexpectedly high prices in the United States for short periods of time, and Dr. Fitzpatrick testified that, with

aggressive marketing, USSD might actually have been able to sell many of its cattle for $15,000 each in 1971.

Yet, South Devon cattle sold in England during 1971 for less than $1,000 per animal, and in that year, Mr. Scully purchased South Devon cattle in England, and imported them to the United States, for substantially less than $3,000 per animal. Such prices create strong doubts about Mr. Hartman's appraisal. Although we are satisfied that South Devon cattle would have sold in the United States during 1971 at a substantial premium over the English price, and although such exceptional cattle may have brought very high prices, it is clear to us that, on the average, the value of the South Devons did not exceed $5,000 per animal.

On this record, it is altogether clear that there was no valuable property supporting the nonrecourse term note, and accordingly, we conclude that the term note represented neither genuine indebtedness nor an actual investment in property. As a result, the petitioners were entitled to deduct neither their share of the amounts reported by USSD as depreciation, to the extent depreciation was attributable to the inclusion of the amount of such note in the depreciable basis, nor their share of the amounts paid by USSD as interest on such note.

We consider next the Commissioner's argument that any deductions to which the petitioners may be entitled are subject to the limitations of section 183. Section 183(a) provides the general rule that if an individual engages in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) provides that deductions which would be allowable without regard to whether such activity is engaged in for profit shall be allowed. Section 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(d) provides that if the gross income from an activity exceeds the deductions from the activity for any 2 of 5 consecutive taxable years, then the activity shall be presumed to be engaged in for profit unless it is established to the contrary by the Commissioner.

In this case, the principal disagreement between the Commis-

sioner and the petitioners concerning section 183 is over whether that section is to be applied at the partnership level or at the partner level.[10] The Commissioner contends that we should apply section 183 at the partnership level and thereby determine whether the partnership, USSD, entered into the sale-leaseback for profit. He insists that there was no profit motive. On the other hand, the petitioners argue that we should apply section 183 at the partner level and thereby determine whether Dr. Hager and Dr. Hampers engaged in cattle activities, both through USSD and on their own, for profit. They contend that Dr. Hager and Dr. Hampers intended to profit from their investments in South Devon cattle.

The petitioners do not challenge the Commissioner's position that generally section 183 is applied at the partnership level.[11] However, they contend that in its partnership return for 1971, USSD made a valid election under section 761(a) not to be subject to subchapter K, relating to partnerships, and they insist that because of the election, we should apply section 183 at the partner level in this case.

Section 761(a) provides that a partnership may elect, in certain circumstances, not to be subject to subchapter K. Essentially, when an election is made under section 761(a), the partners are treated as mere co-owners of property; after the election, it is not necessary to compute partnership income to determine the

---

[10]There is no dispute that sec. 183 applies to this case if we find that there was an activity not engaged in for profit. It is true that sec. 183 was enacted primarily to limit the deductibility of losses incurred in hobbies (*Dunn v. Commissioner*, 70 T.C. 715, 719 (1978), affd. 615 F.2d 578 (2d Cir. 1980)), and it is clear that the losses deducted by the petitioners were not related to a hobby; but in *Jasionowski v. Commissioner*, 66 T.C. 312 (1976), this Court held that the existence of a hobby was not a prerequisite to the application of sec. 183.

[11]In *Estate of Lanier v. Commissioner*, T.C. Memo. 1980–295, affd. on this issue in an unpublished opinion (2d Cir., Apr. 9, 1981), we held that sec. 183 is to be applied at the partnership level. We reasoned as follows:

"We must first decide whether to apply section 183 at the partner level or at the partnership level. The application of section 183 at the partnership level is indicated by the principle that a partner is viewed as engaged in the business of the partnership. *Butler v. Commissioner*, 36 T.C. 1097, 1106 (1961). Applying section 183 at the partnership level is also indicated by section 702(b) which provides that the character of any item of loss in a partner's distributive share shall be determined as if the item were incurred in the same manner as incurred by the partnership. * * * [40 T.C.M. 863, 865, 49 P-H Memo T.C. par. 80,295, p. 80–1319 (1980).]"

Our decision in *Estate of Lanier* is consistent with *Van Raden v. Commissioner*, 71 T.C. 1083 (1979), on appeal (9th Cir., Sept. 18, 1979), where we held that sec. 446(b) is also to be applied at the partnership level.

distributive share of the partners since each partner simply reports on his own Federal income tax return his share of each item of income, deduction, and credit. See sec. 1.761–2, Income Tax Regs.; W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, sec. 3.03[5], p. 3–22 (1978). In this case, USSD made the election under section 761(a) in its Federal partnership return for 1971. However, the Commissioner contends that USSD was not entitled to make the election and that therefore the election was ineffective.

Section 761(a) and section 1.761–2(b)(2), Income Tax Regs., indicate that a partnership may not make the election under section 761(a) unless the election has the consent of all the partners, and section 1.761–2(a), Income Tax Regs., provides that a partnership may not make the election unless the partners reserve the right separately to take or dispose of their shares of partnership property. Here, in the original partnership agreement, the partners of USSD neither consented to the election under section 761(a) nor reserved the right separately to take or dispose of their shares of partnership property. In the amendment of agreement of limited partnership, the partners do appear to have reserved such right and to have consented to the election, but under the original partnership agreement, the amendment was not effective unless executed by the general partners and by limited partners who contributed more than half the capital contributed by limited partners. There is no evidence in the record that any partners other than Dr. Hager and Dr. Hampers executed the amendment. Hence, the petitioners have failed to prove that the amendment was effective. There is no additional evidence showing that the partners consented to the election under section 761(a) or reserved the right separately to take their shares of partnership property, and accordingly, we conclude that USSD did not validly elect not to be subject to subchapter K. Since the petitioners relied solely on the validity of that election to avoid having section 183 applied at the partnership level, and since they have failed to prove that the election was valid, we will seek to determine whether USSD entered into the sale-leaseback for profit.

Section 183(c) defines an activity not engaged in for profit as follows:

(c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.—For purposes of this section, the term "activity not engaged in for profit" means any activity other

than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

The test for determining whether an activity constitutes a trade or business so that the expenses incurred in conducting the activity are deductible under section 162 is whether the primary purpose and intention in engaging in the activity is to make a profit. *Golanty v. Commissioner*, 72 T.C. 411, 425 (1979), affd. in an unpublished opinion (9th Cir., Mar. 25, 1981); *Allen v. Commissioner*, 72 T.C. 28, 33 (1979); *Dunn v. Commissioner*, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980); *Churchman v. Commissioner*, 68 T.C. 696, 701 (1977). The expectation of profit need not be a reasonable one; it is sufficient if there is a bona fide expectation of realizing a profit. Sec. 1.183–2(a), Income Tax Regs.; *Golanty v. Commissioner, supra* at 425–426; *Allen v. Commissioner, supra* at 33; *Dunn v. Commissioner, supra* at 720. The issue of whether there is the requisite intention to make a profit is one of fact to be resolved on the basis of all the surrounding facts and circumstances of the case (sec. 1.183–2(b), Income Tax Regs.; *Golanty v. Commissioner, supra* at 426; *Allen v. Commissioner, supra* at 34; *Dunn v. Commissioner, supra* at 720), and the burden of proving the intention is on the petitioners (*Golanty v. Commissioner, supra* at 426; *Johnson v. Commissioner*, 59 T.C. 791, 813 (1973), affd. 495 F.2d 1079 (6th Cir. 1974), cert. denied 419 U.S. 1040 (1974)).

At trial and in their briefs, the petitioners emphasized that Dr. Hager and Dr. Hampers had a reasonable expectation of profit when they invested in USSD. Although they also argue that USSD entered into the sale-leaseback for profit, it is clear to us that the sale-leaseback was not in fact designed to result in profit for USSD. There are many factors which lead us to our conclusion, but primarily we are influenced by the fact that in 1971 Mr. Bishop and Mr. Stevenson undoubtedly were familiar with the mechanics of importing cattle, since they were general partners of Big Beef. Yet, instead of arranging for USSD to import South Devon cattle at prices not in excess of those paid by Mr. Scully, they helped to arrange the purchase of Big Beef's cattle at enormously inflated prices. It simply cannot be contended that Mr. Bishop and Mr. Stevenson intended that USSD earn profits when USSD paid an average price of more than $15,000 for each animal.

What is more, even if Mr. Bishop and Mr. Stevenson seriously

believed that the cattle were worth what USSD paid for them, they could not reasonably have believed that the value of the cattle would remain that high. Mr. Fesq testified specifically that although prices in the United States for a newly introduced breed were sometimes high, such prices did not persist. Of course, it is possible that prices for the South Devon breed would have remained high if, as Mr. Bishop represented, Big Beef had had the exclusive rights to import such cattle. However, Big Beef had no such exclusive rights when the sale-leaseback was executed, and at that time, Mr. Bishop and Mr. Stevenson could not seriously have believed that, with competition, the U.S. price of South Devon cattle would remain 15 times higher than the price in England. In addition, the financial statements of Big Beef for 1971 indicate that Big Beef failed to fulfill commitments to purchase cattle sired with the semen of its bulls. That failure belies the possibility that Mr. Bishop and Mr. Stevenson were optimistic about the prospects of the South Devon breed in the United States.

The sale-leaseback proposal circulated by Mr. Bishop is further evidence of a lack of a profit motive. The proposal contains no indication that USSD would earn profits, either initially or after becoming established, but merely shows the savings which an investor would realize as a result of deducting USSD's losses from income for Federal income tax purposes. A tax avoidance purpose is not inconsistent with the desire to earn profits (*McLane v. Commissioner*, 46 T.C. 140, 145 (1966), affd. per curiam 377 F.2d 557 (9th Cir. 1967), cert. denied 389 U.S. 1038 (1968); *Knetsch v. United States*, 172 Ct. Cl. 378, 348 F.2d 932 (1965), cert. denied 383 U.S. 957 (1966)), but if an activity is engaged in solely to reduce Federal income taxes, the activity is not considered to be engaged in for profit (*De Woskin v. Commissioner*, 35 T.C. 356 (1960); *Goodstein v. Commissioner*, 30 T.C. 1178 (1958), affd. 267 F.2d 127 (1st Cir. 1959)). In our opinion, the fact that the proposal dealt only with the tax savings, and not with any profits to be earned, is further evidence that USSD was simply seeking tax savings for its members, and not profits.

What occurred after the sale-leaseback was executed also indicates that there was no profit motive. Mr. Bishop and Mr. Stevenson directed the affairs of both USSD and Big Beef, and the possibility of USSD's earning profits depended upon the

efforts of Big Beef. According to Mr. Bishop, after the sale, Big Beef was to begin to test and promote the South Devon breed to create a market for the animals and for the semen of the bulls. However, the record contains no evidence that Big Beef seriously attempted to test and promote the breed. For one thing, Big Beef made no efforts to form a breed association. Dr. Fitzpatrick testified that in the cattle industry, it is necessary to form such an association for promotional and other purposes. Secondly, although there is evidence that Big Beef placed an advertisement for the breed in a magazine in July 1974, there is no evidence of any additional promotional activities arranged by Big Beef. Nor is there evidence that Big Beef ever had the breed tested,[12] and in our opinion, if Mr. Bishop and Mr. Stevenson had been serious about promoting the breed, Big Beef would have tested it as early as possible. Thirdly, Dr. Hager admitted that Big Beef did not provide satisfactory care for the cattle; in fact, Dr. Hager indicated that his reason for withdrawing from USSD was that USSD was not serious about earning profits.

Most importantly, we know from Big Beef's financial statements that from 1971 through 1978, Big Beef sold not a single vial of semen from USSD's bulls. Big Beef was required under the leaseback to pay all expenses for the care of the cattle, to provide reimbursements for abnormal cattle losses, and to pay substantial lease fees. Big Beef's sole means of earning income was through the sale of semen, and Dr. Hager testified that he expected such sales to produce substantial income for USSD. Yet, since it sold no semen, Big Beef earned not a cent of income over the term of the leaseback. A careful examination of all circumstances suggests that there was never any intention to earn income from the sale of semen. If there had been such an intention, Mr. Bishop and Mr. Stevenson would have made sure that the cattle were promoted properly and given proper care. They would have fulfilled their purchase commitments in 1971. In addition, it must have been clear by 1974 that there would be no sales of semen, but Big Beef continued to lease the cattle and pay lease fees through at least 1978.[13]

---

[12]The advertisement which was apparently placed by Big Beef in 1974 includes the results of tests, but such advertisement was not admitted into evidence to show that tests were conducted.

[13]What is more, if the 1974 lease between Big Beef and the petitioners was intended to

Since it appears that there was no intention that Big Beef earn income, the lease fees paid by Big Beef were clearly not paid as a part of a profit-making undertaking. However, their real purpose appears clear; they enabled USSD, after incurring large losses in 1971 through 1973, to report a small profit in 1974 through 1978. In 1972 and 1973, Big Beef paid a lease fee of $112,980 each year; after 1973, the amount of the lease fee changed each year, but in each year, it was sufficient to ensure a small net income for USSD:

| Year | Lease fees | Income |
|------|-----------|--------|
| 1974 | $159,782 | $2,549.61 |
| 1975 | 102,000 | 4,796.12 |
| 1976 | 76,000 | 4,727.80 |
| 1977 | 26,000 | 7,551.56 |
| 1978 | 50,000 | 6,130.64 |

Big Beef incurred no out-of-pocket expense in paying the lease fees or in paying the reimbursements for cattle losses since USSD furnished the necessary funds by making payments to Big Beef for a downpayment, for principal on the promissory notes, and for interest. From 1971 through 1978, Big Beef and USSD paid the following amounts to each other:

| | Payments by USSD | | | Payments by Big Beef | |
|------|----------|-----------|--------------|-----------|--------------------|
| Year | Interest | Principal | Down-payment | Lease fee | Loss reimbursement |
| 1971 | $77,947.38 | --- | $20,000 | --- | --- |
| 1972 | 50,803.69 | $529,000 | --- | $112,980 | --- |
| 1973 | 96,612.00 | --- | --- | 112,980 | $2,828.39 |
| 1974 | --- | 189,500 | --- | --- | --- |
| | --- | 192,000 | --- | --- | 192,700.00 |
| 1975 | 48,000.00 | 54,000 | --- | 102,000 | --- |
| 1976 | 58,177.48 | 30,000 | --- | 76,000 | --- |
| 1977 | 25,645.00 | --- | --- | 26,000 | --- |
| 1978 | 37,041.54 | 11,500 | --- | 50,000 | --- |
| Total | 394,227.09 | 1,006,000 | 20,000 | 479,960 | 195,528.39 |

Thus, during those years, USSD made total payments to Big Beef of $1,420,227.09, and Big Beef made total payments to

parallel the leaseback, that lease is further evidence that there was no intention to sell semen. Under such lease, as under the leaseback, Big Beef's only means of earning profits was from sales of semen. Yet, the animals received by the petitioners when they withdrew from USSD were moved to Nebraska, out of Big Beef's control, and apparently included no bull.

USSD of $675,488.39. The payments by USSD exceeded those by Big Beef by $744,738.70.

In substance, the sale-leaseback represented merely USSD's payment to Big Beef of the capital contributed to USSD by its limited partners. We have already concluded that the term note did not represent a genuine indebtedness or a real investment in the cattle; it served to create a claim for interest deductions and deductions for depreciation by the members of USSD; it also furnished an ostensible reason for USSD to make the principal and interest payments to Big Beef and for Big Beef, in turn, to make the lease payments to USSD so that the latter could report nominal income in the later years. We cannot believe that Big Beef would have made such lease payments if the term note had been paid out and if USSD thereby had failed to furnish the funds from which to make such lease payments.

We recognize that under the leaseback, USSD was entitled to all calves born into its herd. It is possible that Mr. Bishop and Mr. Stevenson expected substantial profits from the sale of such calves. However, there is no evidence to show how many calves and how much profit might reasonably have been expected. It is also true that if, as here, profits are reported from an activity for 2 of 5 consecutive years, the presumption that the activity was engaged in for profit normally applies. However, in this case, the profits reported by USSD after 1973 had no substance, since USSD's income was manufactured, and it is clear that the Commissioner has overcome the presumption. On all the evidence, we must conclude that the sale-leaseback engaged in by USSD was an activity not engaged in for profit.

In conclusion, we find and hold that the term note did not represent a genuine indebtedness and that consequently, the petitioners were not entitled to any deductions for interest or depreciation attributable to such note. We also find and hold that USSD was engaged in an activity not for profit within the meaning of section 183 and that therefore the petitioners' deductions attributable to such activity are subject to the limits of that section. In 1971, the petitioners were entitled to deduct the interest paid on the initial note. The Commissioner allowed $3,175 for such purpose, and since the petitioners have presented

no evidence on the matter, we sustain the Commissioner's determination.

*Decisions will be entered under Rule 155.*