ALAN BRECK AND LUCINDA BRECK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Breck v. Commissioner
Docket No. 12315-80.
United States Tax Court
T.C. Memo 1986-241; 1986 Tax Ct. Memo LEXIS 367; 51 T.C.M. (CCH) 1192; T.C.M. (RIA) 86241; June 16, 1986. Alan Breck and Lucinda Breck, pro se. Jeffrey N. Kelm, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined a deficiency in Federal *369 income tax against petitioners in the amount of $1,670 for their taxable year ended December 31, 1976. The issues presented for decision are: (1) Whether petitioners are entitled to a claimed loss representing their distributive share of the losses of West Texas Company, a California limited partnership, for the year in issue; and (2) whether petitioners are entitled to a deduction in the amount of $1,867, representing payments made by them to the partnership during 1976. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and exhibits attached thereto are incorporated herein by this reference. Alan Breck ("Alan" or "petitioner") and Lucinda Breck ("Lucinda") were husband and wife and residents of Wills Canyon, Cloudcroft, New Mexico, at the time the petition herein was filed. Petitioner timely filed a joint Federal income tax *370 return for their taxable year 1976, using the cash receipts and disbursements method of accounting. During the year in issue, Alan was a practicing physician and Lucinda was a fashion consultant. Background of Persons and Companies Involved
In 1972, Al Landry, Michael Betterton, and other individuals founded American Film Brokers ("AFB"), a California corporation. From AFB's inception, Landry was its president.Betterton served as AFB's vice president and chief financial officer from 1972 until 1976. Prior to 1972, Landry and Betterton had each invested in a motion picture, and Landry had organized a nonprofit company to help various civic organizations raise funds by showing films. Landry and Betterton had no other experience in the movie industry. Raymond Axelrod, though not a founding member, also joined AFB in 1972. Axelrod had extensive experience in the film industry, having been previously employed in managerial capacities by Warner Brothers, United Artists, Eagle Lion, and Allied Artists. American Films Brokers Operations
Generally, AFB would acquire films that the major or large independent distributors had declined to distribute. The films AFB acquired *371 would generally be obtained from the producers under contracts calling for cash or other consideration -- such as payment of the producer's outstanding film laboratory bills -- as a down payment, and percentage payments out of future distribution income. In such deals, the primary area of negotiation with the producers would be the amount of the down payment. AFB always tried to purchase the film for the lowest amount of cash possible and to have the producer take most of his consideration in the form of a percentage of the income to be generated by the distribution of the film. Generally, Betterton would conduct AFB's negotiations with the film producers. AFB usually did not seek Axelrod's advice regarding the maximum down payment that AFB should pay for the films it acquired. Axelrod's duties in connection with AFB's film acquisition were confined to viewing the pictures, judging their suitability within AFB's program, and informing Betterton or Landry that he had located potentially suitable films. Betterton and/or Landry, not Axelrod, would decide which films AFB would acquire. After AFB had acquired a film, Axelrod managed its marketing and distribution. AFB would resell *372 its films to investors, usually limited partnerships. The resales to partnerships normally provided for a cash down payment and principal and interest payments for seven years, with the balance of a promissory note due and payable in 10 years. A warranty agreement allowed the investors to return the firm in lieu of payment of the note. The resale transactions were always structured so that the cash consideration received by AFB from investors would exceed the cash AFB had paid to the producers. Each resale transaction to an investor partnership was accompanied by a film distribution agreement between AFB and the partnership, pursuant to the terms of which AFB was engaged to distribute the film. The investors could change the distributor only by paying the full contract amount for he film. It was AFB's intention to retain control of the film in that way. Due to the passage of the Tax Reform Act of 1976, AFB phased out this program in 1976. History of the Film "West Texas 1870"
In 1970, Alan Gadney released his first motion picture titled West Texas 1870 (sometimes referred to as "the film"). The film was written and directed by Gadney, and took three years to produce, *373 although the film was not in continuous production for three years. At the time that the film was made, Gadney was a graduate student at the University of Southern California. The film was financed through two scholarships, from the Academy of Motion Picture Arts and Sciences and the Directors Guild of America, and an out-of-pocket investment of $5,000. Approximately 50 students worked on the film, which was submitted to the university as Gadney's thesis film. The film was 55-minutes in length. It won numerous awards, including the Cannes Amateur International Film Festival, the Atlanta Film Festival, and the San Sebastian Film Festival, but was poorly received in commercial markets and was not widely shown. The story of West Texas 1870 consisted of the flashback remembrances of an old woman in 1920, back to the days when she was a young girl on the West Texas frontier. The film was reviewed by Hollywood Reporter on March 6, 1970, and by Variety on March 18, 1970. According to John Mahoney, of Hollywood Reporter, the film: is more impressive for the effort that is evident on the screen than the product of that effort. Though 55 minutes in length, it is no more than a *374 short story of character, stretched and surprisingly conventional, marred by moments of hand-held camera wooziness and a frequently overproduced track. It is a perfectly respectable thesis film, but unlike a number of short films to come from the department in recent years, it has virtually no commercial interest or potential. Variety's Rick Setlowe found that the film: Like Miss Porter's stories, is quite interesting in a dull sort of way, lethargically paced as a mid-summer afternoon, and carefully crafted, even slick. But the characters are vivid and memorable.* * * Although its commercial prospects are very limited, "West Texas" is a professional effort in which student Gadney has creatively transformed limitations into assets and originality. It ranks with "Aymonn the Terrible," which Francis Ford Coppola did when at UCLA, as an outstanding example of what can be produced at the student level. West Texas Company
West Texas Company ("WTC") was organized as a limited partnership under the California Uniform Partnership Act, on or about May 31, 1973. According to the certificate of limited partnership, TWC was formed for the stated purpose of acquiring a motion *375 picture titled West Texas for ultimate distribution and/or resale. The limited partnership agreement provided that profits and losses were to be allocated according to the limited partner's respective percentage in WTC. It also provided that the general partner was to be solely responsible for the management of WTC's business, with all the rights and powers generally conferred by law and necessary, advisable, or consistent therewith. The general partner was authorized, inter alia: (1) To expend WTC's capital and income; (2) to acquire, lease, distribute, manage, and dispose of any motion picture; and (3) to enter into an agreement with AFB or any other entity for the leasing, distribution, discounting, development, improvement, maintenance, exchange, trade, or sale of WTC's property at such price as he, in his absolute discretion, deemed to be in WTC's best interest. The agreement further provided that the limited partners were not to participate in the management, conduct, or control of the partnership business and did not have the right or authority to act for or to bind the partnership. WTC's general partner was Jurg Frey, M.D. In addition to the general partner, WTC had *376 nine limited partners, of which petitioner was one. Prior to his becoming a limited partner of WTC, Alan received and studied a 30-page tax opinion, prepared by the law firm of Elisberg & Prager at AFB's request, and distributed by AFB to potential investors, explaining the Federal income tax consequences of the acquisition of a motion picture by a limited partnership. The tax opinion contained a summary of worst conditions, detailing the Federal income tax consequences to a married investor with a $34,000 average taxable income as follows: Year
Cash Outlay
Tax Deduction
Tax Savings
Difference (+)
1973
$ 7,489
$17,364 plus $3,115
$10,819
$3,330 (+)
Investment Tax Credit
(415%)       1974
3,844
8,549 (222%) 4,217
373 (+)
1975
3,244
7,178 (221%) 3,600
356 (+)
1976
2,694
6,091 (226%) 3,074
380 (+)
1977
2,169
5,237 (241%) 2,656
487 (+)
1978
2,034
4,553 (224%) 2,321
287 (+)
1979
2,028
4,557 (225%) 2,323
295 (+)
$23,502
[2] $53,801 + 3,115
$29,010
$5,508 (+)
I.T.C. (286%)
Petitioners read newspaper and magazine articles, an offering memorandum from AFB, a promotional package from AFB *377 -- containing some undated reviews, none of which referred to ther commercial prospects of the film -- and viewed the film prior to its purchase (see infra). Alan became a limited partner of WTC on May 31, 1973, with a partnership share of ten percent. Alan's stated contribution to the partnership was $37,500, payable as follows: (1) a $2,500 cash contribution; and (2) a nonnegotiable promissory note payable to WTC dated April 6, 1973, in the principal amount of $35,000, providing for the payment of interest at an annual rate of 5 percent from April 6, 1973. The cash was paid and the note executed in April 1973. Interest on the note was to be payable on December 15 of each year, commencing on December 15, 1973. Payments of principal were to be made on June 30 of each year, beginning with June 30, 1974. The schedule of payments to be made on the note was as follows: Management
Interest
Principal
Fee (June 30)
Dec. 15
June 30
1973
$1,500
$ 1,375
1974
1,625
$ 1,000
1975
1,587
500
1976
1,567
300
1977
1,555
200
1978
1,547
100
1979
1,542
100
1980
$30,800
Total
$1,500
$10,798
[3] $33,000
*378 The nonnegotiable promissory note provided that "All payments received on this note shall be credited first to interest then due and the remainder, if any, to principal." Petitioners received a letter, dated March 1, 1976, from Betterton. The letter provided, in pertinent part, as follows: Under the terms of the purchase contract on the Film, "West Texas," you will have quarterly payments in 1976 of $466.75. [4] The first of these is now due and you should return your check in the amount of $466.75, made payable to the West Texas Company, in the enclosed envelope. Prompt remittance of these contractual payments will entitle you to a tax deduction of $4,741 for 1976. Alan made principal and interest payments through the year in issue. In 1976, *379 payments in the total amount of $1,400.25 were made, as follows: $466.75 each on March 1, 1976, May 29, 1976, and September 1, 1976. Acquisition by AFB of West Texas 1870 and AFB's contracts with WTC
On April 27, 1973, AFB and Gadney executed a document entitled Motion Picture Purchase and Sale Agreement. Pursuant to its terms, Gadney sold the original color negative of West Texas 1870, the internegative protection print, the composite release print of the film, all other related materials, and all of his right, title, and interest in and to the film, including distribution rights, to AFB. The consideration paid for the above assets was as follows: (1) $2,500 in cash; (2) a promissory note in the principal amount of $7,500, providing for the payment of interest at an annual rate of 10 percent; principal payments on the note, in the minimum amount of $1,000, were to be made each month, beginning on June 15, 1973, and interest was to be paid at the time of the final principal payment; (3) 60 percent of the net proceeds -- as defined in said agreement -- distributed to AFB by WTC until such time as Gadney had received the aggregate sum of $40,000 (including the $10,000 in *380 (1) and (2) above); and (4) 25 percent of any further net proceeds distributed by WTC to AFB. The said agreement further stated that Gadney acknowledged that AFB was purchasing the film for resale to WTC. Both Landry and Betterton recommended that WTC purchase the film. Landry and Betterton were officers of AFB at the time they recommended the purchase of the film by WTC. The negotiations for the purchase of the film were conducted on behalf of WTC by Frey, its general partner. From the outset, AFB stated that a $350,000 purchase price and the amount of the cash down payment were not subject to negotiation. Frey did not inquire about the actual production costs of the film, nor did he consult with an attorney with regard to such matters as copyrights, protection of title, or title insurance. WTC did not obtain an outside appraisal of the film prior to its purchase. On May 31, 1973, AFB, through Landry and Betterton, and Frey, on behalf of WTC, entered into an agreement for the sale of West Texas 1870. The agreement provided that the purchase price was $350,000, payable as follows: (1) A $25,000 cash down payment already paid; and (2) a nonnegotiable promissory installment *381 note for balance of the purchase price, with interest from May 31, 1973, at an annual rate of 5 percent. On the same day, Frey, on behalf of WTC, signed a nonnegotiable promissory installment note to AFB in the principal amount of $350,000. [5] The note provided for principal and interest payments as follows: Management Fee
Principal
Interest
(June 30)
(June 30)
(Dec. 15)
1973
$15,000
$ 9,625
1974
$ 10,000
16,250
1975
5,000
15,870
1976
3,000
15,670
1977
2,000
15,550
1978
1,000
15,470
1979
1,000
15,420
1980
308,000
Totals
$15,000
$330,000
[6] $103,855
In addition to the foregoing payments of principal and interest on the promissory note, and not as a substitute or offset therefor, WTC was to pay AFB: (1) 50 percent of the net proceeds from the film, as therein defined; and (2) 50 percent of the proceeds received by WTC from any sale or refinancing of the film, reduced by the expenses of sale or refinancing. *382 Simultaneous with the sale agreement, AFB and WTC executed a film distribution agreement, under the terms of which AFB was engaged to distribute the film. The said agreement provided that WTC was to: (1) Pay AFB an initial management fee equal to $1,500 per partner of WTC; (2) reimburse AFB for the actual costs of prints and advertising incurred by AFB limited to a maximum of $50,000; (3) pay 10 percent of the gross proceeds as therein defined for its expenses in marketing, leasing, licensing, promoting, distributing, or otherwise dealing with the film, and for its administrative expenses; and (4) pay AFB 35 percent of gross proceeds at the time the promissory note was paid in full. A letter of warranty was also executed on May 31, 1973, pursuant to the terms of which, should: (1) WTC make all prior scheduled payments; (2) WTC not terminate the distribution agreement; and (3) the film not generate sufficient revenues to pay the last scheduled principal payment in the amount of $308,000, then AFB would accept the film and all rights to the film as payment. After the sale by AFB to WTC, Axelrod, the general sales and distributioin manager at AFB, managed the marketing and distribution *383 of the film. In 1973, AFB hired Terence J. Kollman as national sales manager to promote West Texas 1870.
AFB represented to the investors that it had spent $12,797.35 for the advertising, shipping, and promotion of the film between April 27, 1973, and December 31, 1977. It was also represented that the film earned $6,213.47 during the said period. WTC filed Forms 1065, U.S. Partnership Return of Income, with the Internal Revenue Service for its taxable years 1973 through 1976. WTC used the cash receipts and disbursements method of accounting. The following is a summary of the items reported on the said returns: [7]
Items
1975
1976
Gross Receipts
$52 $ 1,291 [8] Depreciation (40,192)
[9] (32,154)
Interest
(15,798)
(15,670)
Distribution Expenses
(48)
(1,280)
Miscellaneous
(23)
(12)
Total Gain or (Loss)
($56,009)
($47,825)
*384 Petitioners claimed a loss in the amount of $4,782, representing their distributive share of the loss claimed by WTC, on their Federal income tax return for their taxable year ended December 31, 1976. In his notice of deficiency dated April 9, 1980, respondent disallowed the claimed loss on the grounds that: (1) It has not been established that creation and operation of the partnership had economic substance or that the partnership engaged in any activity for profit; (2) The portion of the loss attributable to depreciation is disallowed because the partnership [sic] basis in depreciable property has not been established nor has it been established that the partnership could properly claim depreciation in 1976. Further, it has not been established that the method of depreciation used was proper or that it bore a proper relation to a decline in value of the assets; (3) The portion of the loss attributable to purported interest is disallowed because it has not been established that the claimed amount was paid or accrued in 1976 nor that it represents interest on valid indebtedness. Further, the method of accounting used by the partnership does not clearly reflect income; and *385 (4) The part of the loss deduction attributable to other expenses is disallowed because such expenses have not been substantiated as ordinary and necessary business expenses or as incurred in the production of income. OPINION Issue 1: Claimed Deductions and Loss
The first issue for us to determine is the extent, if any, to which petitioners are entitled to deduct their distributive share of WTC's loss claimed for 1976. The determination of this issue depends upon whether WTC is entitled to claimed deductions for interest expense, depreciation, distribution expenses, and miscellaneous expenses. Respondent argues that the claimed loss arose out of an activity "not engaged in for profit" within the meaning of section 183, [10] and that: (1) The limitations therein provided must be applied to the facts herein; and (2) the principal amount of the nonnegotiable promissory note given by WTC to AFB in connection with the purchase of the film is not includable in the film's basis for purposes of computing depreciation and interest expense deductions. *386 Section 183(a) provides that deductions arising from an activity "not engaged in for profit" shall not be allowed, except as provided in section 183(b). [11] If the activity is not engaged in for profit, section 183(b) separates the claimed deductions into two groups: (1) Section 183(b)(1) allows only those deductions which are not dependent upon a profit motive, e.g., interest and taxes; and (2) section 183(b)(2) allows the balance of the deductions which would otherwise be permitted only if the activity was engaged in for profit, but only to the extent that the gross income derived from the activity exceeds the deductions allowed under section 183(b)(1). *387 By its terms, section 183 is not a disallowance provision, but becomes operative when the taxpayer is engaged in an activity in which he is not otherwise entitled to his claimed deductions under sections 162 or 212, viz, where the taxpayer is not engaged: (1) In a trade or business; or (2) in an activity for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income. Sec. 1.183-2(b), Income Tax Regs.; Brannen v. Commissioner,78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Whether a partnership is engaged in a trade or business or in an activity for which deductions are allowable under section 212 is determined at the partnership level. Fox v. Commissioner,80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), *388 affd. without published opinions sub nom. Hook v. Commissioner,Kratsa v. Commissioner,Leffel v. Commissioner,Rosenblatt v. Commissioner,Zemel v. Commissioner,734 F.2d 5-9 (3d Cir. 1984); Siegel v. Commissioner,78 T.C. 659 (1982); Brannen v. Commissioner,supra;Hager v. Commissioner,76 T.C. 759 (1981). The partnership must prove that it engaged in the activities in issue with an actual and honest profit objective. Rule 142(a); Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The inquiry turns on whether the primary purpose and intention of the partnership in engaging in the activity was to make a profit. Fox v. Commissioner,supra;Hager v. Commissioner,supra, and cases cited therein. As used in this context, "primary" means "of first importance" or "principally," Surloff v. Commissioner,81 T.C. 210 (1983); Jefferson v. Commissioner,50 T.C. 963 (1968), citing Malat v. Riddell,383 U.S. 569, 572 (1966), *389 and "profit" means economic profit, independent of tax savings. Surloff v. Commissioner,supra;Shapiro v. Commissioner,40 T.C. 34 (1963). While a reasonable expectation of profit is not required, the taxpayer's profit objective must be bona fide. Bessenyey v. Commissioner,45 T.C. 261 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). The issue is one of fact to be resolved on the basis of all the surrounding facts and circumstances. Sec. 1.183-2(b) Income Tax Regs.; Fox v. Commissioner,supra;Golanty v. Commissioner,72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Partnerships present a special problem in applying section 183. "Partnerships are mere formal entities. Obviously, they do not have independent minds of their own." Fox v. Commissioner,80 T.C. at 1007. In determining partnership intent, we look at the actions taken by the general partner, his knowledge, conduct, expertise, and success in the particular field, as well *390 as any other factor which he relied upon in making partnership decisions, where the management of the partnership's affairs was left to the general partner. See Finoli v. Commissioner, 86 T.C.     (No. 45, April 16, 1986); Siegel v. Commissioner,supra;Brannen v. Commissioner,supra;Hager v. Commissioner,supra.[12]
In determining whether an activity is engaged in for profit, the following factors are to be considered: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the *391 taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. A record of losses over the years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's true intention. Sec. 1.183-2(b)(6), Income Tax Regs. It is not intended, however, that only the aforesaid factors be taken into account in making the determination. Sec. 1.183-2(b), Income Tax Regs.
Petitioners bear the burden of proving the necessary profit objective. Rule 142(a). Frey was WTC's general partner. He conducted the negotiations, on behalf of WTC, for the purchase of West Texas 1870. The record herein is completely lacking of any evidence as to whether Frey had any prior experience or expertise in the negotiation, purchase, and acquisition of motion pictures, yet Frey relied on Landry and Betterton's recommendation that he acquire the film for the partnership. Other than investing in a motion picture prior to 1972 -- and Landry's organizing a nonprofit company to help various civic organizations raise funds by showing films *392 -- Landry and Betterton likewise had no experience or expertise in the movie industry. [13] Furthermore, both Landry and Betterton were officers of AFB at the time they recommended the purchase of the film. AFB was not a disinterested party to the transaction, and it is only reasonable to presume that Landry and Betterton had AFB's, and not WTC's interest in mind when they recommended the purchase of the film to Frey. It is noteworthy that AFB always structured the resale of films to the investors, usually limited partnerships, in such a manner that the cash consideration received by AFB from the investors would exceed the cash AFB paid to the producers. AFB's resale of West Texas 1870 to WTC was no exception. The motion picture purchase and sale agreement executed by AFB and Gadney on April 27, 1973, provided *393 for a "cash" payment of $10,000 as part of the purchase price of the film. This amount was paid as follows: (1) $2,500 in cash; and (2) a promissory note in the principal amount of $7,500. The agreement for the sale of the film executed on May 31, 1973, by AFB and WTC provided, inter alia, for a purchase price of $350,000, $25,000 of which were represented to have been paid in cash. [14]
Frey did not inquire about the actual production costs of the film, nor did he consult with an attorney with regard to such matters as copyrights, protection of title, or title insurance. From the onset of the "negotiations" for the purchase of the film, AFB stated that the $350,000 purchase price and the amount of the down payment, $25,000, were not subject to negotiation. No outside appraisal of the film was obtained prior to the purchase. The record is devoid of any evidence of Frey's inquiring about the desirability of engaging a company other than AFB to distribute the film, even though the possibility of changing the distributor after the film distribution agreement was signed was effectively curtailed by the provision contained in the said agreement -- that *394 the investor could change the distributor only by paying the full contract amount for the film. The record herein is devoid of any evidence of oral or written communications between Frey and the limited partners concerning the activities of the partnership. Nor is there evidence concerning the amount of time and effort devoted by Frey to the activity, or whether there was an expectation that the film might appreciate in value. The partnership's activity (or lack of it) resulted in claimed losses totaling $103,834 for the years 1975 and 1976, yet there is no evidence that Frey made any efforts to improve the situation. Rather, we are satisfied that Frey delegated all control of the distribution of the film to AFB. Yet, if AFB's representations to the investors are taken as true, AFB spent less than $13,000 between 1973 and 1977 to promote a film purportedly worth $350,000. The film earned less than $6,300 in gross receipts through 1977. As early as 1970, the film was reviewed by Hollywood Reporter and Variety Magazine. According to Hollywood Reporter's John Mahoney the film had "virtually no commercial interest or potential." Rick Setlowe of Variety, found that "the commercial *395 prospects [of the film] are very limited." There is no evidence that Frey was successful in carrying on other similar or dissimilar activities. The acquisition of West Texas 1870 was the only transaction into which WTC entered. Alan's brief testimony at trial was limited to his assertions that: (1) He had made some high-risk investments in the past, including motion pictures; (2) he purchased an interest in WTC as an investment; and (3) he was not in the 50-percent bracket. Petitioners' intent is, however, not determinative in ascertaining whether the activity herein was engaged in for profit. As a limited partner, petitioner had no control over the business of the partnership, did not participate in its management or conduct, and had no authority to act for or to bind the partnership. If the determination of whether the activity was engaged in for profit were made at the partner level, different results would flow to the different partners, all resulting from an act of the partnership over which the limited partners had no control. The determination is therefore made at the partnership level. See Brannen v. Commissioner,supra;Hager v. Commissioner,supra. *396 [15]
We hold that petitioners have failed to carry their burden of proving the necessary profit objective. Deductions with respect to the activities herein are therefore limited as provided in sections 183(b)(1) and 183(b)(2). We now turn to section 183(b)(1) to determine the amount, if any, of the deductions which are allowable. This determination is also made at the partnership level. Section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." Respondent disallowed the portion of petitioners' *397 claimed loss attributable to purported interest paid by WTC to AFB with respect to the nonnegotiable promissory note on the grounds that petitioners had failed to prove that the amount was paid or accrued by WTC in 1976; or that the said amount, if paid, represented interest on valid indebtedness. WTC used the cash receipts and disbursements method of accounting. Under this method, amounts representing allowable deductions, with exceptions not pertinent herein, are taken into account for the taxable year in which paid.Sec. 1.461-1(a)(1), Income Tax Regs.
In Hager v. Commissioner,76 T.C. at 773-774, we stated: It is settled that amounts paid as interest must be paid on genuine indebtedness to be deductible under section 163(a) ( Knestch v. United States,364 U.S. 361 (1960); Narver v. Commissioner,75 T.C. 53, 98 (1980), on appeal (9th Cir., Jan. 15, 1981); Golsen v. Commissioner,54 T.C. 742, 754 (1970), *398 affd. 445 F.2d 985 (10th Cir. 1971)) * * *. In the usual sale of property, if part or all of the purchase price is deferred, the obligation to pay the deferred amount represents genuine indebtedness and an investment in property. Mayerson v. Commissioner, at 351-352 * * * Such conclusion does not follow, however, where the principal amount of the indebtedness or the purchase price unreasonably exceeds the value of the purchased property because the purchaser has no incentive to pay off the obligation.[16] If the purchase price and the principal amount of the note unreasonably exceed the value of the property to be purchased, then no genuine indebtedness exists. Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Odend'hal v. Commissioner,80 T.C. 588, affd. on this issue 748 F.2d 908 (4th Cir. 1984); Brannen v. Commissioner,supra;Hager v. Commissioner,supra.
*399 The burden of proving that amounts were paid, which amounts represented interest paid on a valid indebtedness, is on petitioners. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Other than WTC's partnership return for its taxable year 1976, claiming a deduction in the amount of $15,670 allegedly paid as interest, the record is devoid of any evidence that the said amount was actually paid. Tax returns are not self-proving. Halle v. Commissioner,7 T.C. 245 (1946), affd. 175 F.2d 500 (2d Cir. 1949), cert. denied 338 U.S. 949 (1950). Even assuming, arguendo, that the claimed amount was actually paid by WTC as interest, it must have also been paid on a valid indebtedness. West Texas 1870 was acquired by AFB upon payment of $2,500 in cash, delivery of a nonnegotiable promissory note in the principal amount of $7,500, and signature of an agreement providing for a percentage of net proceeds, if any, on April 27, 1973 (see our findings of fact, supra). On May 31, 1973, WTC purchased the film from AFB for a stated price of $350,000, plus a percentage of the net profits, if any. There is no evidence of *400 this record regarding the value of the film as of May 31, 1973, which would justify such a price. Petitioners have failed to show error in the notice of deficiency. The portion of the loss attributable to alleged interest payments on the nonnegotiable note is accordingly disallowed. With respect to amounts allowable under section 183(b)(2), petitioners have failed to prove that they are entitled to any amounts in excess of those allowed by respondent. [17] In this respect, petitioners' failure to prove that the nonnegotiable promissory note constitutes a valid indebtedness, viz, that the purchase price or the principal amount of the note did not unreasonably exceed the fair market value of the film, precludes the inclusion of the principal amount of the note in basis for purposes of computing allowable depreciation of the film. See Estate of Franklin v. Commissioner,supra.
*401 Issue 2. Deduction for Out-of-Pocket Expenses
Petitioners claim entitlement to a deduction in the amount of $1,867 allegedly paid to WTC during 1976. In order for an interest deduction to be allowable under section 163(a), cash basis taxpayers like petitioners must prove that: (1) Payment was made within the taxably year; and (2) the indebtedness is genuine. Hager v. Commissioner,supra;Rule 142(a). As we have found, Alan paid a total of $1,400.25 to WTC in 1976. Thus, petitioners' deduction, if otherwise allowable, is limited to $1,400.25, representing the total amount of payments made to WTC in 1976. Where periodic payments consisting of both principal and interest elements are received, the general rule, known as the "United States Rule," is that such periodic payments are applied first to interest, with any remaining amount being applied to principal, absent any agreement of the parties to the contrary.Story v. Livingston,38 U.S. (13 Pet.) 359 (1839); *402 Estate of O'Leary v. Commissioner,T.C. Memo. 1986-212. The nonnegotiable promissory note in the principal amount of $35,000, dated April 6, 1973, that was signed by Alan provided that in 1976 payment for principal was due on June 30, 1976 and interest was due on December 15, 1976 in the respective amounts of $300 and $1,567. The note also provided that all payments on the note were to be credited first to interest "then due" and the remainder to principal. Petitioners do not argue -- and the record does not show -- that there was any interest due on the note as of March 1, 1976, when the first check in the amount of $466.75 was delivered to WTC by Alan. In accordance with the provisions of the nonnegotiable promissory note, $300 of the said $466.75 are therefore allocable to principal, which was due on June 30, 1976. The remaining $166.75 of the $466.75, together with the $933.50 in payments made on May 29, 1976, and September 1, 1976, totaling $1,100.25, constitute interest which was not due until December 15, 1976. Although respondent's statutory notice, quoted in relevant part in our findings, was broad enough to encompass the determinations that (a) the *403 entire WTC partnership was a sham and (b) that the West Texas 1870 film venture was not entered into by WTC for profit, the entire thrust of respondent's case, both at trial and on brief, was limited to point (b). Respondent did not request any finding that the entire WTC partnership was a sham or was otherwise not to be recognized for tax purposes, and we have made no such finding. While we have upheld respondent's determination regarding the West Texas 1870 venture, it does not automatically follow that WTC was otherwise an invalid or sham organization. As our findings show, WTC was empowered by its articles to enter into other ventures. The fact that no other such ventures were undertaken through 1976 does not preordain that they would have been disregarded for tax purposes if they had been undertaken, using any available capital, including Alan's contribution. Petitioners have established that: (1) Alan became a limited partner of WTC in 1973, under an apparently valid and binding agreement of limited partnership executed on May 31, 1973; (2) in accordance with the provisions of the agreement, Alan executed a bona fide promissory note -- which was unconditional and *404 with full recourse -- in the principal amount of $35,000, providing for principal and interest payments as stated in our findings of fact, supra; and (3) Alan made payments totaling $1,400.25 in 1976, oif which payments $300 and $1,100.25 are allocable to principal and interest, respectively. Petitioners thus made out a prima facie case for deductibility of the interest portion, and the burden of going forward with the evidence then shifted to respondent to prove that petitioners were not entitled to deduct $1,100.25 as interest. Respondent has not presented any such evidence. We are satisfied, and so hold, that petitioners are entitled to deduct $1,100.25 paid as interest on the nonnegotiable promissory note to WTC in 1976, under section 163(a). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. This issue was not raised by the pleadings, but in petitioners' initial brief. Respondent, however, agrees that this Court should decide this issue and addressed it in his reply brief. This issue is, therefore, properly before this Court.Rule 41(b), Tax Court Rules of Practice and Procedure.↩
2. The mathematical addition is incorrect. The correct total amount is $53,529 + 3,115 I.T.C.↩
3. The above schedule of payments, which was part of the note executed by Alan, adds up to only $34,500, rather than the full note amount of $35,000. The discrepancy is unexplained by the record.↩
4. Neither the Agreement for the Purchase and Sale of a Motion Picture Film, dated May 31, 1973, between AFB and WTC, nor the $350,000 nonnegotiable promissory installment note provided for quarterly payments. See infra.↩
5. The discrepancy between the terms of the purchase and sale agreement and the nonnegotiable promissory note is unexplained by the record. ↩
6. The above schedule of payments, contained in the promissory note, made no provision for the payment of interest on the remaining principal balance of $308,000 from December 15, 1979, to June 30, 1980.↩
7. Except for depreciation, the record does not disclose income and expense figures for 1973 and 1974. ↩
8. WTC claimed a depreciable basis in the film of $350,000 and used the 200-percent declining balance method of computing depreciation over a 10-year useful life. Depreciation claimed for 1973 and 1974 was $98,800 and $50,240, respectively. ↩
9. The stipulation of the parties describes this amount as $32,155. WTC's return for 1976 discloses, however, and we have found, that the amount claimed as depreciation in 1976 was $32,154.↩
10. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
11. Sec. 183 provided, in pertinent part, as follows, during the year in issue: SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) Activity Not Engaged in for Profit Defined.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩.
12. See also Deegan v. Commissioner,T.C. Memo. 1985-219↩.
13. Although Axelrod had extensive experience in the film industry -- having been previously employed in managerial capacities by Warner Brothers, United Artists, Eagle Lion and Allied Artists -- AFB did not rely on his expertise in deciding which films AFB would acquire. There is similarly no evidence that Frey relied on Axelrod's expertise in purchasing the film.↩
14. See note 5, supra.↩
15. See also Estate of Freeland v. Commissioner,393 F.2d 573↩ (9th Cir. 1968), affg. a Memorandum Opinion of this Court, where the taxpayer argued that as a limited partner, the intent of the operating partners in the partnership should not be attributed to her. In rejecting this contention, the Second Circuit stated that while the limited partnership may have been an investment to her, the intent of the partnership controlled in determining whether the land owned by the partnership was property described in sec. 1221(1).
16. In Brannen v. Commissioner,78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984), this Court stated that the test was whether the stated purchase price unreasonably exceeded the value of the property, whereas in Hager v. Commissioner,76 T.C. 759↩ (1981), this Court stated that the test was whether the principal amount of the nonrecourse indebtedness unreasonably exceeded the value of the property. On the basis of resolution herein, we need not decide this issue.
17. In calculating the amount of the deficiency herein, respondent disallowed only petitioners' distributive share of the net loss of the partnership, i.e., respondent disallowed only the distributive share of the loss that was in excess of WTC's gross receipts from the activity. Because of our determination that petitioners failed to prove that the activity was engaged in for profit, petitioners derive no further benefits from the provisions of sec. 183 (b)(2)↩.