DAVID A. WEINSTEIN AND EILEEN WEINSTEIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Weinstein v. Commissioner
Docket No. 25898-81.
United States Tax Court
T.C. Memo 1986-376; 1986 Tax Ct. Memo LEXIS 233; 52 T.C.M. (CCH) 186; T.C.M. (RIA) 86376; August 13, 1986. Wilbur Greenberg, for the petitioners. Kenneth J. Rubin, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined a deficiency of $25,403.56 in petitioners' income tax for 1976. The only issue is whether petitioners *234 are entitled to deduct a loss in the amout of $55,639 as a result of the interest of petitioner David A. Weinstein in a partnership known as Cay Associates. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by reference. Petitioners, David A. and Eileen Weinstein, husband and wife, resided in Philadelphia, Pennsylvania, at the time they filed their petition. They filed a joint income tax return for 1976 with the Internal Revenue Service Center in Philadelphia. In early 1976, David A. Weinstein (hereinafter referred to as petitioner) became interested in coal tax shelters. Prior to that time he had no experience in the coal business. In June 1976 he met and discussed coal tax shelters with David Wasserstrom, who had been introduced to petitioner as an excellent tax attorney. Subsequently they contacted a Pennsylvania coal company about leasing some coal properties, but no lease was obtained at that time. Later in the summer of 1976, Wasserstrom called petitioner to determine if he was still interested in a coal shelter. Petitioner met with Wasserstrom and was told about a large *235 tract of land in West Virginia which, according to Wasserstrom, was to be divided into six sites for lease to six separate partnerships. On October 1, 1976, petitioner received from Wasserstrom an engineering report concerning the proposed coal sites and a preliminary draft of an offering memorandum. Wasserstrom told petitioner that the land would be leased by the partnerships from Cannon Coal Company ("Cannon Coal"), whose principals according to Wasserstrom were Frederick Gagnon and Bernard Boyers. Subsequently, petitioner agreed to be the general partner of Cay Associates, a limited partnership formed on December 21, 1976, for the stated purpose of mining coal on Parcel No. 3 (Parcel 3) of a tract of land in West Virginia known as the J. L. Beury Estate (Beury Tract). As general partner, petitioner made a cash contribution of $1,000 to Cay Associates and received a 2.5 percent interest in the partnership. There were 25 limited partners each of whom contributed $25,000 and received a 3.9 percent interest. The total initial capitalization of Cay Associates was therefore $626,000. The interests in Cay Associates were sold pursuant to a private offering memorandum prepared by *236 Wasserstrom. The memorandum contained a revised version of the engineering report petitioner had been shown in October. The original report had been prepared by Brackenrich & Associates, Inc. for Cannon Coal, and estimated that approximately 950,000 tons of coal was recoverable from Parcel 3. At some point after the original report was sent by Brackenrich to Cannon Coal, it was altered in such a way as to increase both the acreage and the estimated coal reserves in Parcel 3. In the altered report it was estimated that 1,250,000 tons of coal were recoverable. The original report reflecting only 950,000 tons was not used in the promotion of Cay Associates. The altered report (hereinafter Brackenrich Report) was accompanied by a covering letter from J. D. Brackenrich dated October 13, 1976, which stated, in part: This report is intended to show an estimate of recoverable reserves of coal on the tract. No core-drillings were made and no surface prospecting was done. * * * Confirmation of the reserve study should be accomplished by additional surface prospecting and core-drilling. * * * Using the figures in the Brackenrich Report, the offering memorandum projected that a $25,000 *237 investment in the partnership would yield a net profit. Relying exclusively on the Brackenrich Report petitioner concluded that the Beury Tract was an economically promising coal property. However, he had no personal knowledge of Brackenrich's reputation, qualifications, or experience and he did not discuss with anyone the advisability of making further tests to confirm the report's estimates as recommended in the covering letter. Prior to trial petitioner had visited Parcel 3 on two different occasions, once in April of 1977 and again in August of the same year. On December 23, 1976, Cay Associates entered into a sublease agreement with Cannon Coal, under which Cay Associates was given the right to mine and remove all coal on Parcel 3.At or about the same time the other five parcels in the Beury Tract were each subleased under similar terms and conditions by Cannon Coal to a separate limited partnership. Under the sublease Cay Associates was required to pay Cannon Coal a minimum royalty of $5.00 per ton of coal mined from Parcel 3 less a credit of $2.25 per ton on an advance royalty of $2,225,000, payable as follows: $475,000 in cash upon the execution of the lease, and a nonrecourse *238 note for $1,750,000 payable in equal quarterly installments to December 31, 1983. In accordance with the sublease, petitioner, as general partner of Cay Associates executed the nonrecourse promissory note to Cannon Coal in the amount of $1,750,000 (the "Royalty note"). The entire sublease including the amount of the advance royalty was negotiated for Cay Associates by Wasserstrom. Petitioner did not participate in the negotiations. At that time, Wasserstrom was the president of Seah Corporation, which was the sole shareholder of the Cannon Coal. In addition to the sublease, Cay Associates entered into a contract with Black Rock Mining Company ("Black Rock"), under which Black Rock agreed to mine and remove the coal from Parcel 3 in return for a percentage of the gross receipts from the sale of the coal. Under the contract Black Rock was not responsible for any start-up costs of the mining operation. Black Rock's principal officers and only shareholders were Gagnon and Boyers, who also controlled Fre Bern Energy, a West Virginia partnership that contracted with Cay Associates to serve as sales agent and marketing consultant with respect to any coal mined by Cay Associates. *239 In the first week after its formation on December 21, 1976, Cay Associates disbursed $623,750 of its initial capital of $626,000. The disbursements included $475,000 to Cannon Coal on the advance royalty and $20,000 to petitioner for services as general partner. No mining operations occurred in 1976. As of August 1977, no mining operations had begun on any of the Beury parcels. Some mining was done later on two of the parcels, but these mines were quickly abandoned when their roofs collapsed. No mining was ever done on Parcel 3. After the mining on two of the parcels was abandoned, Cannon Coal gave the six limited partnerships a joint lease on property located in Kentucky. Although some mining took place on the Kentucky property, it did not extend beyond three months. On its partnership return for 1976, Cay Associates claimed a loss of $2,225,563, by deducting the entire advance royalty plus $563 in organizational expenses. Petitioner's share of the loss, $55,639.00, was used on petitioners' 1976 return to offset taxable income from other sources. Respondent disallowed the loss in its entirety. OPINION The loss claimed by petitioner consists of his share of the advance *240 royalty and his share of the organizational expenses reported on the partnership return of Cay Associates. Since petitioner has presented no evidence in support of his deduction for organizational expenditures, respondent's determination with respect thereto is sustained. Rule 142(a). [1]
With respect to the advance royalty, respondent claims that no deduction is allowable because the partnership was not engaged in a trade or business under section 162. [2] For the reasons stated below, we agree with respondent. To constitute the carrying on of a trade or business under section 162, an activity must "be entered into, in good faith, with the dominant hope and intent of realizing profit, i.e., taxable income, therefrom." Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum *241 Opinion of this Court. See also Hager v. Commissioner,76 T.C. 759, 784 (1981), and the cases cited therein. The expectation of a profit need not be a reasonable one. It is sufficient if there is a bona fide objective of making a profit. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner,Kratsa v. Commissioner,Leffel v. Commissioner,Rosenblatt v. Commissioner,Zemel v. Commissioner,734 F.2d 5-7, 9 (3d Cir. 1984); Hager v. Commissioner,supra.Whether there is an objective to make a profit is a factual determination to be resolved from all the surrounding circumstances. Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). The burden of proof with respect to the requisite *242 objective is on petitioners. Rule 142(a); Golanty v. Commissioner,supra at 426. In making this determination, [as to intent] objective facts are to be given greater weight than the parties' statements of their intent. Fox v. Commissioner,supra at 1007. Whether a partnership is engaged in a trade or business with the objective of making a profit is to be determined at the partnership level. Fox v. Commissioner,80 T.C. at 1006; Siegel v. Commissioner,78 T.C. 659, 698 (1982); Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). In determining the profit objective of a limited partnership where the conduct of the partnership's affairs was left to the general partner, attention must be focused upon the general partner's knowledge, conduct, expertise and success in the particular field as well as any other factor which he relied upon in making partnership decisions. See Siegel v. Commissioner,supra;Brannen v. Commissioner,supra;Hager v. Commissioner,supra.
In Golanty v. Commissioner,supra, *243 we set forth a list of factors that have been considered relevant in previous cases to a determination of whether an activity was entered into for profit. We find that the following factors from that list are relevant here: (1) The manner in which the activity was conducted; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets would appreciate in value; (5) the taxpayer's history of income or losses with respect to the activity; and (6) the amount of profits, if any, which were earned. Before considering the above factors, we note that, in a district court proceeding brought against petitioner and others by two limited partners in Cay Associates, petitioner testified that Cay Associates was formed for the primary purpose of obtaining tax benefits. That statement of petitioner's intent is well supported by the nonbusinesslike manner in which the partnership venture was conducted. From the outset, it was destined to create nothing but losses because the advance royalty agreed to by petitioner as general partner was so large that it was extremely unlikely that the partnership *244 could even pay off the royalty note. Donald Bondurant, an expert witness for respondent, is a mining engineer familiar with West Virginia properties. He examined Parcel 3 and the other parcels on the Beury Tract and prepared a report in which he concluded that the potential recoverable coal reserves on Parcel 3 totaled only 146,247 tons, as compared to the 1,250,000 tons estimated in the altered Brackenrich Report. If his conclusion is correct, and if we assume that the partnership was able to recover all 146,247 tons, the partnership's income, after expenses, would have been approximately $450,000 less than the $1,750,000 royalty note. [3]
Bondurant's estimate obviously conflicts with Brackenrich's estimate. However, we are satisfied that the *245 Bondurant estimate is more reliable for several reasons. First, the Brackenrich Report in the offering memorandum had been altered to inflate both the size of Parcel 3 and the estimate of recoverable coal. Second, the recovery factor [4] used in the Brackenrich report was unrealistically high. Third, the Brackenrich Report ignored readily available geological and mining data regarding the Beury Tract. This data included six previous core-drillings on the Beury Tract and a prior unsuccessful mine on Parcel 3. Petitioner claims that even if the Brackenrich Report was erroneous, he was entitled to rely on it. Although there may be circumstances under which a taxpayer may rely on an erroneous estimate or appraisal to justify an investment, those circumstances are not present here. The first page of the report warned the reader that the findings set forth therein were based on visual inspections of other parcels and that core-drillings should be made to confirm the findings. Petitioner, however, did not discuss the advisability of making core-drillings with anyone and made no effort *246 to determine Brackenrich's reputation and qualifications. In other words, petitioner accepted the report at face value, without taking any of the usual precautionary measures expected of a reasonable and prudent investor. In addition to agreeing to pay an unjustifiably high royalty, other nonbusinesslike activity on petitioner's part included failing to inspect the property until more than four months after the lease was signed and only twice during the entire operation. Furthermore, his spending of all but $2,250 of the partnership's capital within the first week of its existence and thereby leaving it with insufficient funds to commence mining operations, cannot be considered the act of a prudent businessman. Petitioner claims that he was told by Wasserstrom that Cannon Coal agreed to advance such funds, but there is no such provision in the contracts, nor any other evidence, of such an agreement. Petitioner also did not act as a prudent businessman in permitting Wasserstrom to represent the partnership in negotiations with a corporation in which Wasserstrom had a substantial interest. Even if petitioner was not aware of this conflict of interest, his lack of such knowledge *247 was due to his negligence in not ascertaining the relationship. Turning to the other factors listed in Golanty, we have found that petitioner had no previous experience in the coal business and has presented no evidence that any of his advisers had such experience. Although petitioner contends that he spent considerable time and effort in carrying on the venture, we are unable to make such a finding since the only evidence presented on this point consisted of self-serving memorandums by petitioner to his files. With respect to history of the partnership's profits and losses, we find there is no history of profits because the partnership never even had any receipts from the venture and therefore incurred nothing but losses. From all of the foregoing, we conclude that the partnership venture was not an activity engaged in for profit and, thus, did not constitute the carrying on of a trade or business. [5] Consequently, petitioner is not entitled to deduct his share of any part of the partnership loss. *248 Decision will be entered for respondent.
Footnotes
1. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise indicated.↩
2. Petitioner relies solely upon section 162 and does not claim that the royalty is deductible under sections 212 or 183.↩
3. The partnership's potential income, after expenses, was computed as follows: ↩
Tons of Coal
$ 146,247.00
Times the Sales Price per Ton
$36.00
5,264,892.00
Less Black Rock's Minimum Commission
3,474,828.70
of 66% of Gross Sales
1,790,063.30
Less Management Fees of $ .60 per ton
87,748.20
1,702,315.10
Less Cannon Coal's Royalty of
402,179.25
$2.75 per ton
Income, After Expenses
$1,300,135.90
4. The "recovery factor" is the percentage of coal on the site that can be commercially mined.↩
5. Because we find that the partnership venture did not constitute the carrying on of a trade or business, it is unnecessary to address respondent's alternative arguments that section 1.612-3(b)(3), Income Tax Regs.↩, prohibits deducting the advance royalty and that any permissible deduction should not include the amount of a non-recourse royalty note.