RICHARD WAYNE HARVEY and KAREN S. HARVEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harvey v. Commissioner
Docket No. 4899-85.
United States Tax Court
T.C. Memo 1988-13; 1988 Tax Ct. Memo LEXIS 13; 54 T.C.M. (CCH) 1508; T.C.M. (RIA) 88013; January 11, 1988. George Fewson, for the petitioners. James B. Martin, Jr., for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined deficiencies in petitioners' 1981 and 1982 Federal income taxes in the amounts of $ 15,506 and $ 24,148, respectively, and in addition to tax for 1981 pursuant to section 6651(a)(1) [1] in the amount of $ 298. The issues for decision are: (1) whether petitioners' horse breeding operation was an "activity not engaged in for profit" within the meaning of section 183 and (2) whether *15 petitioners are liable for an addition to tax for late filing under section 6651(a)(1). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and related exhibits are incorporated herein by this reference. Petitioners, husband and wife, resided in Golden, Colorado at the time the petition in this case was filed. They have two sons, Jeff and Chad, both of whom were minors during the years in issue. Mr. Harvey is the president and sole shareholder of Centennial Dry Wall Co., Inc. (Centennial), a dry wall contracting corporation which he founded and developed into a successful company. During the years involved, both he and Mrs. Harvey were employed by Centennial; their combined salary for 1981 was $ 84,900 and for 1982 was $ 96,200. Petitioners' salary was their only source of income. Petitioners' horse breeding activities began in 1980; prior to that time both Mr. and Mrs. Harvey had a fondness for horses which was shared by their two sons. They began their horse breeding activities by buying a mare, as a 4-H activity, which was kept on their two are plot in rural Golden, Colorado. [2]
*16 As a prelude to going into this activity, Mr. Harvey read and studied "everything he could" about quarter horses, quarter horse breeding, and the quarter horse industry. He also spoke to quarter horse experts, including Gary L. Carpenter. Mr. Carpenter is an experienced quarter horse breeder and teacher of horse production and industry, a course involving the financing and marketing of horses, at Colorado State University. Mr. Carpenter advised petitioners that to be successful in quarter horse breeding, they needed to retain good advisors, to emphasize quality stock and to build and maintain their reputation by keeping their name and horses in front of people. Petitioners followed this advice. Petitioners spoke with Mr. Carpenter regularly. In addition, beginning in early 1981, they received advice from Gary Bill Atchison. Mr. Atchison had 20 years of experience in various aspects of the quarter horse industry, had taught quarter horse-related courses at Colorado State University and was the owner and manager of a quarter horse breeding facility. Mr. Harvey considered Mr. Atchison to be the most knowledgeable source of information regarding quarter horse breeding and the *17 quarter horse industry in all of Colorado. He spent days with Mr. Atchison attempting to learn all he could about the quarter horse industry, particularly the economic aspects of quality quarter horse breeding. Mr. Atchison and Mr. Harvey also discussed heritability factors, equine health and nutrition, and how to select quality breeding stock. Mr. Atchison also referred Mr. Harvey to other quarter horse experts, including trainers, breeders, veterinarians, and the teaching staff at Colorado State University, when Mr. Harvey needed information in areas beyond Mr. Atchison's expertise. Mr. Harvey traveled out of state a great deal, frequently accompanied by Mr. Atchison, to attend horse sales and to study nationally renown breeding and marketing programs. In addition, petitioners attended quarter horse shows and watched various trainers at work to educate themselves regarding the horse breeding industry. Before purchasing a particular quarter horse, petitioners analyzed the horse's show record, whether the purchase would be profitable, and whether the horse's genetic characteristics would enhance the high quality petitioners hoped to establish in their breeding program. The *18 following table reflects petitioners' buying and selling activities with respect to their quarter horses: Horse
Foaled
Type [3]
Purchased
Cost
Sold
Price
Cody *
SC
*/80
$    200 */80
$   200
Molly *
M */80
850 */80
500
Miss
Gladiator
1971
M 6/80
2,500
4/82 *
Mongo the
Second
1974
G 8/80
4,500
9/82
4,500
Roy Jay
Skip Jane
1977
M 10/80
2,000
9/85 *
Opie's Beau
Ribbon *
G 10/80
900
5/81
650
Twister
Lass **
1970
M 1/81
4,500
9/83
4,500
Terrible
Scotchman
1972
G 1/81
4,700
7/82
4,500
Dollar's
Silver Dust *
G 3/81
550 */81
600
Boston
Bill ***
1976
G 6/81
3,700
5/83
2,400
Miss Charley
Hall
1981
M 9/81
7,500
2/83 *
Windches-
terette
1980
M 11/81
5,000
12/84
Died
Prettily ****
Impressed
1981
M 12/81
4,000
--
--
Zippos
Punkin
1978
M 1/82
7,081
--
--
Miss Fancy
Step *****
1973
M 8/82
20,007
--
--
Skip's Cash
Penny
1978
M 9/82
8,200
--
--
Thirsty
Hombre
1970
G 11/82
3,500
--
--
Silvers ****
Slippers
1980
M 11/82
3,004
--
--
*19 Petitioners pastured some mares with Bill Atchison in 1981, and in 1982 they rented nearby pasture land from David Heimbecher. Petitioners focused primarily on the purchase of mares. However, they also purchased geldings because of their even temperament and because geldings are better riding and show horses than mares. In order to increase the visibility of their operations and to build and maintain their reputation as breeders of quality quarter horses, petitioners advertised in a regional quarter *20 horse magazine and participated in approximately 40 horse shows per year. They relied heavily on horse shows on the theory that potential buyers of their horses would attend these shows. Petitioners' horse showing activities enabled them to accumulate points for their horses with the AQHA, the only American organization through which quarter horses can be registered. Points are accumulated over the horse's career and once a horse accumulates a certain number of points, it is able to compete in the World Quarter Horse Show. When petitioners began their breeding operations, they attempted to be as economical as possible. Except for hiring reputable trainers (including Mr. Atchison) and a certified public accountant to prepare the income tax returns and review the books, petitioners hired no outside help. Mr. Harvey spent over 40 hours a week working with the horses. Mrs. Harvey also worked long hours. Having a bookkeeping background, she maintained the records for the quarter horse operations. Separate records were kept of stud fees, feed and tack expenses, show expenses, shoeing, veterinary exams, and worming. She also kept an inventory of tack and other equipment. Records *21 were kept of the purchases and sales of horses, each documented by a bill of sale, so that the amount of money invested in each horse could be ascertained. Finally, records were maintained for boarding expenses, expenses for training the horses, and expenses of family members who exhibited the horses in shows. A separate checking account for the breeding operations was opened in 1982, and a cash receipts journal was maintained throughout 1981 and 1982. In addition to maintaining the records of the breeding operations, Mrs. Harvey cleaned stalls and groomed and conditioned the horses. She also exhibited the horses in shows. One of the horses she exhibited as an AQHA champion. Mr. Atchison characterized Mrs. Harvey as an excellent rider with a lot of natural talent and a competitive edge. Mrs. Harvey's responsibilities required her to devote full-time to the horse breeding activity. Petitioners' two sons participated in horse shows. Mr. Harvey saw the youth horse market as a particularly valuable area and, therefore, encouraged his sons to become involved with the horses. However, the children were cautioned not to become emotionally attached to any particular horse because *22 each horse was for sale. In addition to participating in horse shows, petitioners' son, Jeff, spent approximately 20 hours each week cleaning stalls and feeding and grooming the horses. During the summer, Jeff spent considerably more time each week with the horses since the horse shows in which he participated lasted all day. In addition to performing much of the work themselves, petitioners attempted to minimize their costs by keeping their start-up costs low. Rather than incur the expense of purchasing additional acreage, petitioners conducted much of their breeding operations on the two acre tract on which their residence was located. Mr. Harvey built a barn on the property during 1981 and 1982. Petitioners also spent between $ 8,000 and $ 9,000 to construct fencing on the property during 1981. Mr. Harvey expected that these improvements would help increase the value of the real estate. Petitioners were aware that they probably would not realize a profit from their breeding operations for the first few years. The breeding of quarter horses takes at least three to four years to become profitable because the gestation period for horses is 11 months and because the best *23 time to sell the horses is not until they are at least two to three years old. Instead of focusing solely of profit during the first few years of their operations, petitioners focused on laying a solid foundation for their future operations. Petitioners, therefore, began their operations slowly and economically, believing this to be a sound approach to the horse breeding industry. They eventually became well-respected in the horse breeding community. On their joint Federal income tax returns, petitioners deducted losses of $ 29,374 in 1981 and $ 54,569 in 1982 from the operation of their quarter horse breeding activity. [4] Respondent disallowed such losses on the basis that petitioners' horse breeding operation was an activity not engaged in for profit. [5]
Respondent also determined that petitioners' 1981 *24 return was not timely filed and thus petitioners were liable for an addition to tax pursuant to section 6651(a)(1). ULTIMATE FINDING OF FACT Petitioners' quarter horse breeding activity was an activity engaged in for profit during the years in issue. OPINION The primary issue for our determination is whether petitioners' horse breeding activity was an "activity not engaged in for profit" within the meaning of section 183. Section 183(a) provides, in general, that an individual will not be allowed any deduction attributable to an activity "if such activity is not engaged in for profit." Section 183 (c) defines an activity "not engaged in for profit," as any activity that is not deemed a trade or business for purposes of section 162 or not deemed to be for the production of income for purposes of section 212(1) or (2). [6] Therefore, before we can apply section 183, we must first determine whether the deductions from the activity are allowable under section 162 or 212. *25 Deductions are allowable under section 162 for the expenses of carrying on an activity which constitutes a trade or business of the taxpayer. [7] Deductions are allowable under section 212 for the expenses incurred in connection with an activity engaged in for the production or collection of income or for the management, conservation or maintenance of property held for the production of income. [8]
The threshold test for determining whether an activity constitutes a trade or business so as to allow a deduction for expenses under section 162 is whether the primary purpose and intention *26 of the taxpayer in engaging in the activity is to make a profit. Hager v. Commissioner,76 T.C. 759, 784 (1981); Golanty v. Commissioner,72 T.C. 411, 425 (1979), affd. in an unpublished opinion (9th Cir. 1981); Allen v. Commissioner,72 T.C. 28, 33 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980); Churchman v. Commissioner,68 T.C. 696, 701 (1977). It is not crucial that the expectation of profit be a reasonable one; it is enough that the taxpayer has a bona fide objective of realizing a profit. Section 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1083); Golanty v. Commissioner, supra.
Petitioners bear the burden of proving that they engaged in their horse breeding activity with the requisite profit objective. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). We have found as the ultimate finding of fact that such was the case. The issue of whether an activity was engaged in for profit *27 is one of fact to be resolved on the basis of all the surrounding circumstances. Finoli v. Commissioner,86 T.C. 697, 722 (1986); Beck v. Commissioner,85 T.C. 557, 570 (1985); Flowers v. Commissioner,80 T.C. 914, 931-932 (1983). However, in determining whether petitioners engaged in the activity with the requisite profit objective, we give greater weight to objective factors than to the taxpayer's statement of intent. Section 1.183-2(a), Income Tax Regs.; Beck v. Commissioner, supra;Flowers v. Commissioner, supra.
Section 1.183-2(b), Income Tax Reg., provides a nonexclusive list of relevant factors, which are in large part a synthesis of prior case law, to be considered in determining whether an activity is engaged in for profit. Allen v. Commissioner,72 T.C. at 33; Benz v. Commissioner,63 T.C. 375, 382-383 (1974). These factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets *28 used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Section 1.183-2(b), Income Tax Regs. No single factor is controlling, but rather it is an evaluation of all the facts and circumstances in the case, taken as a whole, which is determinative. Section 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner,86 T.C. 360, 371 (1986). We first consider whether petitioners conducted their horse breeding activity in a businesslike manner; we believe they did. Mrs. Harvey was scrupulous in her maintenance of records which detailed all aspects of petitioners' operations. The maintenance of complete and accurate books and records indicates that an activity is carried on in a businesslike manner. Section 1.183-2(b)(1), Income Tax Regs.
Petitioners, particularly Mr. Harvey, went to great lengths to develop their expertise in quarter horse breeding. *29 Although Mr. Harvey had little prior experience with horses, he sought the advice of as many experts as he could to gain knowledge about the quarter horse industry. Preparation for an activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer entered into the activity for profit. Section 1.183-2(b)(2), Income Tax Regs.
We next examine the amount of time and effort petitioners devoted to their horse breeding activity. Mr. Harvey devoted more than 40 hours a week to the breeding operations. In addition, Mrs. Harvey's responsibilities with respect to the breeding operations required her full-time attention. Even petitioners' son, Jeff, devoted significant time to the operations. We now consider whether petitioners expected that the assets they used in their quarter horse breeding activity would increase in value. Petitioners expected that their horses would appreciate in value; indeed, one of the functions served by petitioners attending horse shows was that it enabled their horses to accumulate points with the AQHA, thus increasing the value of the horses and the *30 amounts which could potentially be charged for stud fees or offspring. The history of losses resulting from the activity bears upon petitoners' profit motive. However, the purpose to make a profit may exist even in the face of a history of losses unaccompanied by any gains whatever. Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967); Whitte v. Commissioner,23 T.C. 90 (1954), affd. 227 F.2d 779 (6th Cir. 1955), cert. denied 351 U.S. 939 (1956). This is particularly true when such losses occur in the formative years of a business, especially one involving horse breeding. Bessenyey v. Commissioner, supra.
Prior experience in similar or dissimilar activities is also to be considered. Petitioners had no experience with any similar activities. Mr. Harvey had been successful, however, in developing his dry wall contracting business. We next consider whether, and to what extent, petitioners derived occasional profits from the activity. Petitioners derived no profit from their horse breeding activity from the *31 time they commenced such activity throughout the years in issue. Finally, we consider whether personal pleasure or recreation was involved in the activity. Petitioners acknowledge that they and their sons enjoyed their horses; but the attainment of satisfaction from one's work does not diminish the business nature of the enterprise. Despite the degree of enjoyment petitioners and their sons may have derived from the horses, the breeding activity, particularly on the scale at which petitioners conducted it, required a great deal of hard work, effort and devotion. Based upon the record as a whole, [9] we conclude that petitioners engaged in their horse breeding activity with a bona fide profit objective and are thus entitled to deduct their expenses pursuant to section 162. Having determined that petitioners are entitled to deduct their horse breeding expenses, the section 6651(a)(1) addition to tax issue for late filing is rendered moot. *32 To correct mathematical errors in petitioners' 1981 and 1982 tax returns, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. The land was zoned MR-1, Mountain Residential. Conducting a horse breeding business is not a permitted use of property zoned MR-1. ↩
3. The letters in the "Type: column have the following meanings: SC, Stud Colt; M, Mare; and G, Gelding. * Information not available. ** Registered with the AQHA in the name of Jeff Harvey from January 1981 until December 1981, and in the name of Chad Harvey from December 19812 until sold in 1983. *** Registered with American Quarter Horse Association (AQHA) in the name of Jeff Harvey. **** Petitioners owned only a one-half interest in Prettily Impressed and Silvers Slippers. $ 4,000 is the cost of petitioners' 50% interest in Prettily Impressed, and $ 3,004 is the cost of petitioners' 50% interest in Silvers Slippers. ***** Purchased by petitioners while in foal. ↩
4. Petitioners also deducted losses from the operation of their horse breeding activity in 1980, 1983 and 1984. They made no election under section 183(e). ↩
5. As a result of his disallowance of the losses, respondent adjusted petitioners' itemized medical and sales tax deductions. Respondent also disallowed an investment credit taken with respect to a horse trailer. ↩
6. Section 183(c) provides as follows: (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. ↩
7. Section 162 provides, in relevant part, as follows: (a) IN GENERAL. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * * ↩
8. Section 212 provides, in relevant part, as follows: In the case of an individual there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year -- (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; * * * ↩
9. At a zoning hearing in August, 1984 (relating to a variance for a setback for petitioners' barn), Mr. Harvey allegedly stated that his occupation was not selling horses and that if it were "he would be in the poorhouse." We do not take this statement as an admission against interest, as suggested by respondent, since we recognize that Mr. Harvey's primary source of income came from his dry wall construction business and he might have thought his involvement in Centennial to be his occupation. ↩